Argued and submitted November 3, 1993; reassigned June 22, decision of the Court of Appeals reversed and judgment of the circuit court affirmed October 6, 1994

In the Matter of the Adoption of
Loren Kyle Edgar Quinn, a Minor.

Peter Gordon QUINN
and Kylene Johnson Quinn,
*Petitioners on Review,*

*v.*

Maki WALTERS,
*Respondent on Review.*

(CC A91-010; CA A71493; SC S40020)

881 P2d 795

Thomas V. Dulcich, of Schwabe, Williamson & Wyatt, Portland, argued the cause for petitioners on review. With him on the petition was Mildred J. Carmack.

Craig J. Dorsay, of Meyer & Wyse, Portland, argued the cause and filed the response for respondent on review.

Before Carson, Chief Justice, and Peterson,** Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

GRABER, J.

Fadeley, J., filed a dissenting opinion.

Unis, J., filed a dissenting opinion in which Fadeley, J., joined.

** Peterson, J., retired December 31, 1993.

## GRABER, J.

This is an adoption proceeding. The first issue presented is whether there was sufficient admissible evidence in the record that the child whose adoption is sought is an "Indian child" within the meaning of the Indian Child Welfare Act of 1978 (ICWA), 25 USC § 1901 *et seq.*[1] If there was sufficient evidence on that point, the second issue is whether a provision of ICWA, relating to a biological parent's right to withdraw consent to the adoptive placement of an Indian child,[2] applies to the adoption of a child who did not assertedly qualify as an Indian child within the meaning of ICWA until after the child's biological mother gave what Oregon law would treat as irrevocable consent to the adoption if an Indian child were not involved.[3] We hold that there was not sufficient

---

[1] 25 USC § 1913(4) (1988) provides in part:

" 'Indian child' means any unmarried person who is under age eighteen and is * * * eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]"

[2] 25 USC § 1913(c) (1988) provides:

"In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent."

25 USC 1903(1)(iv) (1988) defines "adoptive placement" as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption."

[3] ORS 109.312(2)(a) provides in part:

"A person who gives consent to adoption under subsection (1) of this section may agree concurrently or subsequently to the giving of such consent that the consent shall be or become irrevocable, and may waive such person's right to a personal appearance in court * * *. The certificate of irrevocability and waiver shall be in effect when the following are completed:

"(A) The child is placed for the purpose of adoption in the physical custody of the person or persons to whom the consent is given;

"(B) The person or persons to whom consent for adoption is given have filed a petition to adopt the child in a court of competent jurisdiction;

"(C) The court has entered an order appointing the petitioner or some other suitable person as guardian of the child * * *;

"(D) The Children's Services Division * * * has filed * * * a * * * home study * * *;

"(E) Information about the child's social, medical and genetic history * * * has been provided * * * by the person giving consent to the adoption; and

"(F) The person signing the certificate of irrevocability and waiver has been given an explanation by an attorney who represents the person and who does not also represent the adoptive family * * *."

admissible evidence in the record that the subject child is an Indian child within the meaning of ICWA and, accordingly, affirm the judgment of adoption without reaching the second issue.

On April 9, 1991, Maki Walters, then 15 years old, gave birth to a son (Child). Walters had decided during her pregnancy that she would release her child for adoption. She met the prospective adoptive parents in this case, the Quinns, in the fall of 1990, and remained in contact with them from time to time thereafter. The Quinns, who were represented by counsel, also provided Walters with a separate lawyer to advise her regarding the adoption process.

In December 1990, the Quinns' lawyer, knowing of Walters' Cherokee heritage, inquired of the Cherokee Nation in Tahlequah, Oklahoma, whether Walters' paternal grandmother, Lela Fay Brewer Walters, was an enrolled member of that tribe. The Cherokee Nation responded by letter that neither Walters nor her named grandmother was registered with the tribe and that, therefore, the tribe "is not empowered to intervene in this matter."[4]

On the date that Child was born, Walters executed an "Affidavit of Birth Mother" stating, among other facts, that she was the natural mother of Child. Walters also executed a "Surrender and Consent" to the adoption of Child; a "Certificate of Irrevocability and Waiver of Personal Appearance"; and a "Statement of Understanding." The assertions in the "Surrender and Consent" included the following:

> "I permanently surrender and release all of my parental rights, custody, guardianship, control to and over the child to the [Quinns].
>
> "* * * * *
>
> "I understand that this consent will be irrevocable under the provisions of ORS 109.312(2)(a) and in any event will be irrevocable after the decree of adoption is signed."

---

[4] In context, the "matter" referred to was the prospective adoption of Child by the Quinns.

The "Certificate of Irrevocability and Waiver of Personal Appearance" stated in part:

> "I, Maki Walters, do hereby certify that I understand the Surrender and Consent to adoption executed by me * * * shall become irrevocable as set forth under ORS 109.312-(2)(a) * * *."

The Statement of Understanding asserted in part:

> "I want to permanently give my child born April 9, 1991 to the [Quinns] for adoption and I choose them to be the parents for my child.
>
> "* * * * *
>
> "I know that if I do not wish to sign a consent to this adoption, I can refuse and my child will remain with me.
>
> "* * * * *
>
> "I understand that by signing a Certificate of Irrevocability and Waiver of Personal Appearance, the Surrender and Consent will be irrevocable after the Petition for Adoption is filed and the requirements of ORS 109.312(2)(a) are fulfilled.
>
> "* * * * *
>
> "I have reviewed this Statement of Understanding with my attorney."

In addition, the "Affidavit of Birth Mother" signed by Walters on April 9, 1991, included the following assertion:

> "I am not a member of any Indian tribe nor, to my knowledge, am I eligible for enrollment in any tribe. We contacted the Cherokee Nation several times by telephone and by letter because I believe my father's grandmother was a member of the tribe.[5] The Cherokee Nation advised that it is not empowered to intervene in this matter."

Similarly, the "Surrender and Consent" stated:

> "My child is not an 'Indian child' as defined in the Indian Child Welfare Act (15 USC [§] 1901 et seq.)."

---

[5] As noted above, the one written inquiry that is in the record concerned Walters' paternal grandmother, Lela Fay Brewer Walters, not Walters' paternal great-grandmother. Walters does not assert that the discrepancy between the one written inquiry and the Affidavit of Birth Mother (referring to several written and telephonic communications) has any legal significance.

The Quinns obtained physical custody of Child on April 10, 1991. They immediately filed a petition to adopt Child and were appointed guardians of Child.

On April 22, 1991, when Child was 13 days old, Walters filed in the adoption proceeding a document entitled "Revocation of Consent to Adoption," in which she stated:

> "The * * * Indian Child Welfare Act [25 USC § 1901 et seq.] does apply to the minor child in that the child's maternal great-grandfather is an enrolled and full-blooded member of the Cherokee Indian Tribe and I am now advised that I may also be an enrolled member of the said tribe."

On May 14, 1991, Walters filed a motion to dismiss the adoption proceeding. In that motion, she asserted that Child

> "is an Indian Child as defined by [25 USC § 1903(4)], and Maki Walters' consent to adoption is not valid under [25 USC § 1913]. Maki Walters may withdraw her consent at any time prior to a final decree of adoption being entered."

At a July 24, 1991, hearing, Walters offered in evidence a notarized affidavit from the Registrar of the Cherokee Nation of Oklahoma. That affidavit is dated July 22, 1991; it states that, according to tribal records, Walters and her father are "duly registered" members of the Cherokee Nation of Oklahoma.[6] The affidavit further states that "any biological child of Maki Olivia Walters is eligible for membership in the Cherokee Nation of Oklahoma."

The Quinns' counsel objected to the admission of that affidavit, on the ground that "it is a hearsay statement to prove the truth of the matter asserted. I am not in a position to waive any foundation or other evidentiary objections to it." The trial court overruled the objection without explanation and admitted the affidavit. The trial court also admitted, over the Quinns' hearsay objection, testimony by Walters' father that he was a member of the Cherokee Nation.

At the conclusion of the hearing, the trial court denied Walters' motion to dismiss the adoption proceeding, reasoning that Walters had not been a member of a tribe at the time she signed the irrevocable consent to adoption. On August 15, 1991, the court granted the judgment of adoption.

---

[6] Walters asserts that she became duly registered on July 19, 1991.

Walters appealed from the judgment of adoption, assigning as error the trial court's denial of her motion to dismiss the proceeding based on the applicability of ICWA. In their response, the Quinns cross-assigned as error the admission of the affidavit of the Registrar of the Cherokee Nation and the admission of testimony by Walters' father that he was a member of the Cherokee Nation.

The Court of Appeals, sitting *in banc*, reversed. *Quinn v. Walters*, 117 Or App 579, 845 P2d 206 (1993). That court concluded that, under the "plain meaning" of 25 USC § 1913(c) (1988), "the consenting parent has until the entry of the final adoption or termination judgment to revoke consent to adoption. State adoption law cannot interfere with that federal right." 117 Or App at 582. On the Quinns' first cross-assignment of error, the Court of Appeals concluded that the trial court erred in admitting the affidavit of the Registrar, because that document was hearsay that was not admissible under any exception to the hearsay rule. *Id.* at 585. The court held, however, that it "cannot know whether, had the trial court made the correct ruling on the evidence issue, [Walters] could have presented other, admissible, evidence to prove [C]hild's connection with the tribe." *Id.* at 586. Concluding that it would be "grossly unfair" to deny Walters that opportunity, the court remanded the case for rehearing, excluding the inadmissible evidence. *Id.* at 586, 587.[7]

Two judges dissented. The dissenters reasoned that ICWA does not apply to a child who has not been part of an "Indian cultural setting" and that, in any event, there was no admissible evidence that Child was an Indian child. *Quinn v. Walters*, 117 Or App at 587-93 (Edmonds, J., dissenting).

The Quinns petitioned for review. We allowed the petition.[8] We now reverse the decision of the Court of Appeals and affirm the judgment of the circuit court.

---

[7] The Court of Appeals did not address the Quinns' assignment of error relating to the testimony of Walters' father. Because of our disposition of this case, we also do not address that assignment of error.

[8] We limit our review to questions of law. *See* ORS 19.125(4) ("When the Court of Appeals has tried a cause anew upon the record, the Supreme Court may limit its review of the decision of the Court of Appeals to questions of law.").

Walters gave what ordinarily would be valid, irrevocable consent to the adoption of Child, under ORS 109.312. Indeed, Walters does not argue that her consent was defective when given; she argues only that she had a later right to revoke that consent pursuant to 25 USC § 1913(c). As stated, the underlying issue in this case is whether 25 USC § 1913(c) applies to the adoption of a child who assertedly qualified as an "Indian child" within the meaning of ICWA before the entry of the final adoption judgment, but after the child's biological mother gave what Oregon law would treat as irrevocable consent to the adoption if an Indian child were not involved. If so, then "irrevocable" consent to the adoption of a child, given pursuant to ORS 109.312 in those circumstances, would not operate to prevent the biological mother from withdrawing that consent. *See* US Const, Art VI, cl 2 (the Constitution of the United States, and laws of the United States made pursuant thereto, "shall be the supreme Law of the Land, * * * any * * * Laws of any State to the Contrary notwithstanding"). *See also* 25 USC § 1901(1) (1988) (Congress finds "that * * * clause 3, section 8, article I of the United States Constitution provides that 'The Congress shall have Power * * * To regulate Commerce * * * with Indian tribes' and, through this and other constitutional authority, Congress has plenary power over Indian affairs." (footnote omitted)).

Before we reach that issue, however, we analyze whether there was sufficient evidence at the hearing to prove that Child is an Indian child within the meaning of ICWA. If not, then ICWA — however it may be construed — does not apply and Walters' valid, irrevocable consent to the adoption of Child, under ORS 109.312, would prevent her from withdrawing consent.

■  We first note that the Oregon Evidence Code applied, generally, to this proceeding.[9] Although the hearing arose as a result of Walters' motion to dismiss the adoption proceeding, the hearing also was a hearing on the merits of the adoption. *See* ORS 109.307(1) (providing for a hearing on the merits of a petition for adoption). The Oregon Evidence Code applies to such proceedings. *See* OEC 101(2) (the Code applies

---

[9] The circuit court, and both parties, treated the hearing as one to which the Oregon Evidence Code applied.

generally to civil proceedings); *State ex rel Juv. Dept. v. Beasley*, 314 Or 444, 449, 840 P2d 78 (1992) (Oregon Evidence Code applies to a proceeding to terminate parental rights).

We next consider whether any statute outside the Oregon Evidence Code establishes specifically what evidence is admissible, or sufficient, to demonstrate that a child is an Indian child within the meaning of ICWA. *See* OEC 802 (hearsay is admissible if so "provided by law"). In response to a question from this court, concerning Oregon evidentiary law, Walters argued for the first time that, although the Oregon Evidence Code applied generally to the proceeding, it did not apply to the determination of whether Child is an Indian child because of the liberal policies of ICWA.

■■ That argument is circular. It presupposes the application of ICWA before the applicability of ICWA has been established. Moreover, nothing in ICWA says or suggests that particular evidence, such as hearsay, must be admitted even if it is not admissible under a state's evidentiary law. Finally, Walters did not preserve this argument at the hearing or raise it on appeal and, consequently, the argument is not reviewable. *See* ORAP 5.45(2) (requiring preservation of error).

■ The dissents cite two state statutes, but neither statute answers the evidentiary question. ORS 109.312(3) provides:

> "Consent to the adoption of a child subject to the Indian Child Welfare Act shall not be valid unless the requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) are met. In accordance with the Indian Child Welfare Act a certificate of irrevocability is not valid for a child who is subject to the Indian Child Welfare Act."

That statute pertains to cases in which a child is "subject to" ICWA but does not suggest what evidence is admissible, or sufficient, to demonstrate that a child is "subject to" ICWA.

■ ORS 109.350 provides in part that "[i]f, upon a petition for adoption * * * the court is satisfied * * * that, *if applicable*, the requirements of [ICWA] have been met, * * * a decree shall be made." (Emphasis added.) That statute governs what a trial court must consider *if* ICWA is "applicable" but, like ORS 109.312(3), does not suggest what evidence is

admissible, or sufficient, to demonstrate that ICWA is "applicable."

No other statute, apart from the Oregon Evidence Code, is argued to control the evidentiary question presented. We turn, then, to the application of the Oregon Evidence Code.

■ As previously stated, the trial court admitted into evidence an "Affidavit" executed by the Registrar of the Cherokee Nation, which stated that Walters was an enrolled member of that tribe as of July 22, 1991, and that any biological child of Walters "is eligible for membership" in the tribe. To the extent that those facts were admissible in evidence, they demonstrated that Child was an "Indian child," within the meaning of ICWA, as of July 22, 1991.

The Court of Appeals held that the trial court erred in admitting the affidavit, because it was hearsay that did not fall within any exception to the general rule against admitting hearsay. 117 Or App at 585; see OEC 801(3) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); OEC 802 ("Hearsay is not admissible except as provided" in the rules of evidence.). We have considered all of the possible hearsay exceptions and agree with the Court of Appeals that none of them applied to the affidavit in question.

Accordingly, the trial court erred in overruling the objection and admitting the Registrar's affidavit. In the absence of the affidavit, there was not sufficient evidence before the court that Child was "eligible for membership" in the Cherokee Nation so as to be an Indian child within the meaning of 25 USC § 1903(4).

■ It is true that Walters' father testified that, at the time of the hearing, he was a member of the Cherokee Nation of Oklahoma.[10] No evidence linked that fact, however, with tribal membership on the part of his daughter or eligibility for tribal membership on the part of her biological child. To the

---

[10] The Quinns objected to his testimony. We need not decide whether their objection was well taken, because his testimony, even if admissible, did not establish that Child was an Indian child within the meaning of ICWA.

contrary, there was evidence that some of Child's ancestors are non-Indian and that the Cherokee Nation requires that particular facts be established for eligibility, including enrollment of certain ancestors by 1906, enrollment of a natural parent, and a particular degree of "Indian blood."

In summary, there was not sufficient admissible evidence that ICWA applies to Child. For that reason, Walters did not establish that her consent to the adoption of Child, given pursuant to ORS 109.312 and conceded by Walters to be valid and irrevocable if ICWA does not apply, could be withdrawn.

Walters argues that the Quinns cannot prevail on the basis of insufficient evidence as to the applicability of ICWA because, at the hearing, the Quinns did not place in issue Child's eligibility for membership in the Cherokee Nation. We read the record differently. The Quinns' trial memorandum quoted 25 USC § 1903(4), defining "Indian child," and argued that neither Walters nor Child was a member of an Indian tribe and that, consequently, "ICWA does not apply to the case at hand."

Walters also argues that the Quinns waived their objection to the affidavit at the hearing. Again, we read the record differently. As noted above, the Quinns' counsel objected to the admission of the affidavit, stating that "it is hearsay, an out of court statement offered to prove the truth of the matter asserted. I am not in a position to waive any foundation or other evidentiary objections to it."

For the foregoing reasons, we conclude that the trial court did not err in entering the judgment of adoption.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**FADELEY, J.,** dissenting.

The power to grant an adoption, when exercised, changes an individual from membership in one family to another. The adopted person is lost to his birth family and, in cases such as this, the culture into which he was born. ORS 109.350. That is an awesome power. When the power is used to remove an Indian child from the surrounding most likely to connect that child with his or her cultural heritage, that

decision unintentionally continues the gradual genocide[1] of the Indians in America.

The majority treats this case, settled on a motion to dismiss the mother's withdrawal of consent to adopt and objection to adoption, as if it were an adversary trial to a jury. Adoptions are not adversary trials insofar as the judge's role is concerned. The adoption judge here absolutely knew that the child was an Indian child before he allowed the adoption or signed the judgment of adoption. He knew that the Indian Child Welfare Act (ICWA), 25 USC § 1901 *et seq*, applied and knew that the state adoption statutes apply. His error of law offends the very law that empowered him to grant adoptions by ignoring its provisions applicable to the consent of the mother of this Indian child.

The circuit court's decision to grant the adoption on the ground that the consent of the Indian mother was irrevocable is contrary to state and federal statutes previously enacted to prevent unintended genocide. Both the Oregon legislature and Congress have acted to protect Indian children and the tribes (whose future the children are) from loss of each child's Indian identity. The trial court's ruling should be reversed because it is contrary to law. I would apply the laws intended to preserve and honor the Indian culture as stated herein.[2]

The majority rewrites the adoption statutes contrary to the intent of Oregon's elected legislative representatives. The majority overlooks the provisions of the protective act adopted by the federal Congress, including administrative rules adopted to carry out the act of Congress.

Congress knew that there is no Indian tribe without members. Congress listened and learned that a tribe has no heart except the hearts of its members and that the spirit of

---

[1] "By genocide we mean the destruction of a nation or of an ethnic group." Ralph Lemkin, *Axis Rule in Occupied Europe* (1944). Lemkin coined the word. Bartlett's Familiar Quotations, 704 n 2 (16th ed 1992) (footnote omitted).

[2] The Indian cultures have suffered frequent diasporas. The Cherokee here involved and their Trail of Tears are no exception. The state and federal statutes cited herein were enacted to recognize and affirmatively remedy the culturally destructive effects of those diasporas. The statutes do not contain the limits on their remedial application that the majority interprets into them; indeed, by their terms, the statutes specifically do not permit taking of liberties that the majority takes.

its members is the spirit of the tribe. Congress understood that the life of a tribe exists only in its future and its future is its children. Congress knew that all children are desirable to parent and that part of the joy of parenting is guiding the child's future.

Listening, knowing, and understanding, Congress acted to save the tribe by saving its future existing only in its children. Congress enacted The Indian Child Welfare Act of 1978, 25 USC § 1901 *et seq*. One section relevant to this case, 25 USC § 1913(a),[3] in part provides that:

> "Any consent given prior to, or within ten days after, birth of the Indian child shall not be valid."

Consents within ten days after birth involving an Indian child are *always invalid* under the federal statute. In this case, birth occurred on April 9, the consent was signed the same day. The adoption petition was filed on April 10. The 15-year-old Indian mother promptly withdrew her consent. But the adoption court judge held that the consent, once given, was irrevocable, notwithstanding the federal law and the state law to the contrary that I discuss below.

Subsection (c) of 25 USC § 1913 also applies. It flatly states:

> "In any voluntary proceeding for * * * adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent."

---

[3] 25 USC § 1903(1)(ii) defines "termination of parental rights" to "mean any action resulting in the termination of the parent-child relationship." An adoption terminates that relationship. ORS 109.350 ("[A] decree shall be made * * * ordering that from the date of the decree the child, to all legal intents and purposes, is the child of the petitioner"). Thus, the consent in this case was void.

25 USC § 1913(a) requires that consent to adoption of an Indian child must be entered before a judge who personally must explain the consequences of the consent. That was not done here. Subsection (c) additionally provides:

> "In any voluntary proceeding for termination of parental rights to, *or adoptive placement of*, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of final decree of termination or adoption, as the case may be, and the child shall be returned to the parent." (Emphasis added.)

Thus, the consent was voidable by the birth mother's written withdrawal filed in this case before the petition to adopt was considered on its merits.

25 USC § 1914 creates a right in a parent of an Indian child *and in "the Indian child's tribe"* to

> "petition any court of competent jurisdiction to invalidate such action ["termination of parental rights under State Law"] upon a showing that such action violated any provision of section[s] * * * 1913 of this title."[4]

Without notice to the tribe or valid consent, an adoption is an act of genocide, an elimination of the tribe's future.

Listening, knowing, and understanding, the Oregon legislature also acted to protect the tribes' futures and their children's heritage. Oregon Laws of 1983, chapter 302, provides new, mandatory rules in Oregon adoption proceedings. Section 1(5) in part requires:

> "The adoption shall comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et. seq.), if applicable. Every adoption petition involving the Indian Child Welfare Act shall include the following:
>
> "(a)　A statement of the efforts to notify the appropriate Indian tribe or tribes of the adoption[.]"

Most significantly, section 2(5) of Oregon's 1983 Act provides:

> "Consent to the adoption of a child subject to the Indian Child Welfare Act *shall not be valid* unless the requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et. seq.) *are* met."[5] (Emphasis added.)

---

[4] Although we need not decide it here, it appears likely that 25 USC § 1912 also would apply to this case after the biological parent withdrew her consent. Formal notice of a proposed adoption of an Indian child must be given to the child's tribe or to the Secretary of the Interior under that federal statute section.

[5] The majority, in effect, finds ambiguity in the statute, without saying so; namely, that it is not clear that proof of the child's Indian heritage can be made before a decree was entered but after a petition containing a consent was filed. The majority then legislates that Indian heritage may be proved only by records existing *before* initial petition filing.

Sande Schmidt, Staff Attorney, American Legal Services/Native American Program, and LeRoy W. Wilder, Confederated Tribes of Siletz, Association of American Indian Affairs, testified, as witnesses before the Senate Judiciary Committee of the Oregon Legislative Assembly in May of 1983, that the goals were to protect the interests of Indian families and halt the unwarranted break-up of Indian families, to protect tribal interests, and to protect non-Indian adoptive families. The minutes of that meeting reflect the following exchange:

"SCHMIDT said that it applies to any adoption involving an Indian child. Efforts to determine whether the child is an Indian or not are not relevant to the

The Oregon legislature also has enacted an additional amendment, immediately following the invalid-consent provision of section 2(5) of chapter 302, Oregon Laws, 1983, previously quoted. The new amendment states:

"In accordance with the Indian Child Welfare Act a certificate of irrevocability is not valid for a child who is subject to the Indian Child Welfare Act." ORS 109.312(3).

The Oregon legislature thus has expressly interpreted the federal act to provide that a certificate of irrevocability of consent is "not valid" in the circumstances of this case.

There is absolutely no doubt that all parties knew, from the start, of the child's Indian ancestry, and specifically of the Cherokee bloodline. Petitioners' attorney's statements to the court, among other sources, make that clear. The record is replete with knowledge of the child's Indian ancestry through his mother. The mother's father testified in the adoption case hearing that he was an enrolled member of the Cherokee Nation headquartered in Oklahoma. His pedigree testimony alone, never overcome by any other evidence, is sufficient to invoke the provisions of ORS 109.350 and other laws, had there otherwise been any doubt in this case. The trial court made no finding to the contrary but, instead, relied on the untenable proposition that, even as to an "Indian child," a consent once given is irrevocable. 25 USC § 1913(a), quoted in part above, flatly prohibits the irrevocability of the consent at birth involved here.

Under Oregon adoption statutes, a court must be satisfied by the affirmative showing of those who seek the adoption. ORS 109.350, as amended by Oregon Laws 1983, chapter 302, section 3, in part provides:

"If, upon a petition for adoption * * * *the court is satisfied* * * * *that, if applicable, the requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) have been met* * * * a decree shall be made * * *. In an adoption subject to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.), the state

---

Act. The question of whether reasonable efforts were made to determine this is up to the court.

"HENDRIKSEN [State Senator] asked if it would be voided if it is discovered that the child is an Indian and they have not followed the Act.

"WILDER said yes." Minutes, Senate Judiciary Committee, May 5, 1983, pp 6-7.

court shall provide to the United States Secretary of the Interior a copy of the decree together with the other information required by the Indian Child Welfare Act. (25 U.S.C. § 1901 et seq.)'' (Emphasis added.)

The requirement is that the *court* be ''satisfied that the requirements of the Indian Child Welfare Act have been met'' before an adoption may be granted. Those legislative enactments concerning adoption law permit the court to which an adoption petition is presented to grant the adoption only if the court is ''satisfied'' that the requirements of the Indian Child Welfare Act ''are met.'' That places the burden to satisfy the court on those seeking the adoption, not on the child's Indian mother, grandfather, or the Cherokee Nation in which everyone now knows they are either enrolled as tribal members or eligible for enrollment.[6]

That requirement is given equal stature to all other requirements that condition a court's decision to terminate one familial relationship of a child and create a different one. On all of those conditions[7] to adoption alike, the petitioner seeking to cut off one family and to attach the child to different relationships and, perhaps, cultures, bears the burden of satisfying the judge that the adoption legally may, and factually should, be completed.

The concepts on which the state and national legislatures acted to protect the tribe's interest in the child may, perhaps, be understood from this quote:

"Indian parents from the very beginning direct their children's attention outward, toward the land, the sky, the tribe and its history, its customs and traditions. * * * This is not a

---

[6]

"The adoption shall comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.), if applicable. Every adoption petition involving the Indian Child Welfare Act shall include the following:

"(a) A statement of the efforts to notify the appropriate Indian tribe or tribes of the adoption; and

"(b) A statement of the efforts to comply with the placement preferences of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) or the placement preferences of the appropriate Indian tribe." Or Laws 1983, ch 302, § 1(5).

[7] The conditions I speak of here, including the statutes discussed, are first-step considerations under *Zockert v. Fanning*, 310 Or 514, 518, 800 P2d 773 (1990). That step involves parental consents, or substitutes for them, necessary to terminate the natural parents' rights and a child's rights as to her natural parents.

matter of distraction but a matter of conviction — the parent's belief that a child is not the property of a certain family but belongs to a tribe, a people, and, just as important, a given landscape, a visible segment of the natural world. Day by day Indian children learn not only to appreciate and feel at home in that world, but to consider its rhythms and demands as of the highest consequence." Robert Coles, M.D. IV, *Children of Crisis, Eskimos, Chicanos, Indians,* 520 (1st ed 1978).

The need to understand the structure of other cultures before deciding issues that involve that structure is emphasized by a report recently received by this court from a task force study initiated and funded by this court that states:

"Among the conclusions: * * *

"* * * * *

"7.   Judges handling family law cases involving minorities often lack an understanding of the traditions and cultural practices of minority families."[8]

The trial judge's decree should be reversed because it is based erroneously on holding that the consent was irrevocable, contrary to the statutes declaring that such consent was not valid and that such consents cannot be made irrevocable in the circumstances of this case. The proper law to apply is the requirement that an adoption concerning an Indian child may go forward only if the judge hearing the adoption petition is "satisfied" that the requirements of the Indian Child Welfare Act are met. The judge could not have been satisfied here, had he applied that statutory standard rather than relying on the revoked consent, by holding it "irrevocable," contrary to, provisions by state and federal statutes.[9] No adoption is possible under either state or federal

---

[8] Oregon Judicial Department, Office of the State Court Administrator, Report of the Oregon Supreme Court Task Force on Racial/Ethnic Issues in the Judicial System 3 (May 1994).

Washington state's judicial branch has also studied their courts and recommended, *inter alia,* a cultural awareness program as part of the effort toward "elimination of existing bias." Report of Minority and Justice Task Force 198, Washington State Office of Administrator of the Courts (1990).

[9] My brother, Unis, J., points out that the best interests of the Indian child also militates against a state granting its blessing to the adoption in this case. I agree with his dissent but think that consent is the dispositive issue reached in this case. Best interests is not in issue where there is no valid consent to adopt. Moreover, that consent as to an Indian child cannot be held sufficient until the interest of the tribe in

law absent consent or a substitute for it such as termination of parental rights by a separate proceeding complying with due process.

### UNIS, J., dissenting.

"Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. * * * Orderly rules of procedure do not require sacrifice of the rules of fundamental justice." *Hormel v. Helvering*, 312 US 552, 557, 61 S Ct 719, 85 L Ed 1037 (1941). Yet today, the majority, in a hypertechnical procedural ruling, denies substantive rights recognized by Congress belonging to a birth mother, a child, and an Indian tribe.[1] Because the majority opinion defeats the congressional intent underlying the Indian Child Welfare Act (ICWA) and results in a grave miscarriage of justice, I respectfully dissent.

In this adoption proceeding, birth mother sought to withdraw her consent to the adoption of Child pursuant to 25 USC § 1913(c) (1988), a provision of the ICWA, which provides in part:

"In any voluntary proceeding for * * * adoptive placement of[] an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of * * * adoption * * * and the child shall be returned to the parent."

That statute allows a parent to withdraw consent to an adoption if (1) there is a voluntary proceeding for adoptive placement of (2) an "Indian child" and (3) the parent withdraws consent before the entry of a final decree of adoption.

In this case there is no dispute that this is a voluntary proceeding for adoptive placement of a child. *See* 25 USC §

---

the child has been determined affirmatively pursuant to 25 USC § 1914. That did not occur here. ORS 109.312(3) expressly states:

"Consent to the adoption of a child subject to the Indian Child Welfare Act shall not be valid unless the requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) are met. In accordance with the Indian Child Welfare Act a certificate of irrevocability is not valid for a child who is subject to the Indian Child Welfare Act."

[1] Because this case concerns the Indian Child Welfare Act, I use the term "Indian," chosen by Congress, throughout this opinion in lieu of the term "Native American."

1903(1)(iv) (1988) ("adoptive placement" means "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption"). Neither is there any dispute that birth mother sought to withdraw her consent before the entry of the final decree of adoption. Rather, the disputed question is whether Child qualified as an "Indian child"[2] at the time relevant to birth mother's withdrawal of consent under 25 USC § 1913(c) (1988).

That disputed question raises two issues — one legal and one factual. The legal issue is when, for purposes of 25 USC § 1913(c) (1988), a child involved in an adoption proceeding must qualify as an "Indian child." The factual issue is whether Child in this adoption proceeding qualified as an "Indian child" at the time relevant to birth mother's withdrawal of her consent under 25 USC § 1913(c) (1988). The trial court, in addressing the legal issue, held that a child must qualify as an "Indian child" at the time that the consent is given in order for a parent to invoke 25 USC § 1913(c) (1988). The majority, in addressing the factual issue, holds that there was not sufficient evidence to establish that Child qualified as an "Indian child" at any time relevant to this proceeding. I strongly disagree with both of those holdings, and I would affirm the decision of the Court of Appeals, but for different reasons. Accordingly, I dissent.

I begin with the legal issue. The trial court construed 25 USC § 1913(c) (1988) to apply only if the child qualified as an "Indian child" at the time that the parent gave his or her voluntary consent to the adoption. Birth mother argues that the trial court erred in so holding. She argues that, under 25 USC § 1913(c) (1988), a parent may withdraw his or her consent at any time prior to the entry of the final adoption decree, provided that the child qualifies as an "Indian child" at any time before the entry of the final decree of adoption. For the reasons that follow, I agree with birth mother.

Neither this court nor the Supreme Court of the United States previously has considered the legal issue presented by this case. In *Mississippi Choctaw Indian Band v.*

---

[2] An "Indian child" is defined by the ICWA as "any unmarried person who is under eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 USC § 1903(4) (1988).

*Holyfield*, 490 US 30, 109 S Ct 1597, 104 L Ed 2d 29 (1989), however, the Supreme Court of the United States was called on to construe another provision of ICWA, the meaning of the term "domicile" in 25 USC § 1911 (1988). This court should examine the Supreme Court's opinion in that case for methodological guidance in construing the provision at issue here.

The Supreme Court first noted that the "ICWA itself does not define" the disputed term and that the meaning of the term "is, of course, a matter of Congress' intent." *Id.* at 43. The Court stated:

> "The initial question we must confront is whether there is any reason to believe that Congress intended the ICWA definition of [the term] to be a matter of state law. While the meaning of a federal statute is necessarily a federal question in the sense that its construction remains subject to this Court's supervision, Congress sometimes intends that a statutory term be given content by the application of state law. We start, however, with the general assumption that in the absence of a plain indication to the contrary, Congress when it enacts a statute is not making the application of the federal act dependent on state law. One reason for this rule of construction is that federal statutes are generally intended to have uniform nationwide application. * * * A second reason for the presumption against the application of state law is the danger that the federal program would be impaired if state law were to control. For this reason, we look to the purpose of the statute to ascertain what is intended.
>
> "* * * * *
>
> "* * * It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-a-vis state authorities. * * *
>
> "* * * * *
>
> "We therefore think it beyond dispute that Congress intended a uniform federal law [regarding the disputed term] for the ICWA." *Id.* at 43-47 (citations omitted; footnotes omitted; internal quotation marks omitted).[3]

---

[3] In reaching that conclusion, the Supreme Court noted "the likelihood that, had Congress intended a state-law definition of domicile, it would have said so. Where Congress did intend that ICWA terms be defined by reference to other than

The Court then determined the meaning of the disputed term under federal law. The Court considered the ordinary meaning of the term, *id.* at 47-49, examined other provisions of the ICWA, *id.* at 49, and considered the statute's legislative history, *id.* at 49-50.

Here, this court must construe a provision of the ICWA. Keeping in mind the Supreme Court's explanation of the general presumption against "making the application of [a] federal act dependent on state law" and its determination that Congress "was concerned with the rights of Indian families and Indian communities vis-a-vis state authorities," this court should apply the Supreme Court's methodology of federal statutory construction. Therefore, I begin with the words of 25 USC § 1913(c) (1988); I then consider other provisions of ICWA; and, finally, I examine the legislative history of the statute.

25 USC § 1913(c) (1988) does not expressly qualify a biological parent's right to withdraw consent to the adoption of an "Indian child" by reference to when the child qualifies as an "Indian child." Neither does it expressly state that that determination is to be "given content by the application of state law." *See Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 US at 43 (explaining that, unless Congress plainly indicates its intent that a statutory term be given content by the application of state law, the Court will presume that Congress did not so intend). To the contrary, the wording of 25 USC § 1913(c) (1988) is broadly permissive as to the biological parent's exercise of that right: the parent may withdraw consent "for any reason *at any time prior to the entry of a final decree.*" 25 USC § 1913(c) (1988) (emphasis added). Thus, the plain and unambiguous text of 25 USC § 1913(c) (1988) strongly supports birth mother's argument.

I next examine other provisions of the ICWA for assistance in determining the meaning of 25 USC § 1913(c) (1988). 25 USC § 1901 (1988) sets forth congressional findings relating to the ICWA. It states in part:

"Recognizing the special relationship between the United States and the Indian tribes and their members and

federal law, it stated this explicitly." *Mississippi Choctaw Indian Band v. Holyfield,* 490 US 30, 47 n 22, 109 S Ct 1597, 104 L Ed 2d 29 (1989).

the Federal responsibility to Indian people, the Congress finds —

"* * * * *

"(2)   that Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;

"(3)   that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children * * *;

"(4)   that an alarmingly high percentage of Indian families are broken up by the removal * * * of their children from them * * * and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

"(5)   that the States * * * have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."

Those findings demonstrate that Congress was concerned with the preservation of Indian families and Indian tribes in the United States, particularly through the maintenance of Indian children's connections with those families and tribes.

25 USC § 1902 (1988) sets forth a congressional declaration of policy in regard to the statute. It states:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture * * *."

That declaration of policy suggests that Congress considered the "best interests" of Indian children to be served by restrictions on their removal from Indian families or tribes and that it intended that custody proceedings involving Indian children be governed by certain substantive standards and procedures established by Congress. *See also* 25 CFR § 23.3 (policy of the ICWA is to "prevent the arbitrary removal of Indian children from their families and tribes and to ensure

that measures which prevent the breakup of Indian families are followed in child custody proceedings").

On balance, the other provisions of the ICWA, discussed above, suggest that, in enacting 25 USC § 1913(c) (1988), Congress did not intend the right of a biological parent to withdraw consent to the adoption of an "Indian child" to be qualified by any provision of state law, including the provision of Oregon law governing irrevocable consent to adoption, ORS 109.312(2), unless the state law in question provides a higher standard of protection of the parent's right.

Finally, as did the Supreme Court in determining the meaning of the term at issue in *Mississippi Choctaw Indian Band v. Holyfield, supra,* I examine the legislative history of the ICWA for assistance in interpreting 25 USC § 1913(c) (1988). The ICWA was enacted in 1978. In considering the ICWA, the House Interior and Insular Affairs Committee explained:

> "[T]his committee has been charged with the initial responsibility in implementing the plenary power over, and responsibility to, the Indians and Indian tribes. In the exercise of that responsibility, the committee has noted a growing crisis with respect to the breakup of Indian families and the placement of Indian children, at an alarming rate, with non-Indian foster or adoptive homes. Contributing to this problem has been the failure of State officials, agencies, and procedures to take into account the special problems and circumstances of Indian families and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future.
>
> "While the committee does not feel that it is necessary or desirable to oust the States of their traditional jurisdiction over Indian children falling within their geographic limits, it does feel the need to establish *minimum Federal standards and procedural safeguards in State Indian child custody proceedings designed to protect the rights of the child as an Indian, the Indian family and the Indian tribe.*" HR Rep No. 1386, 95th Cong, 2d Sess 19 (1978), *reprinted in* 6 US Code Cong & Adm News 7530, 7541 (1978) (emphasis added) (hereinafter "House Report").

I conclude that the plain and unambiguous wording of 25 USC § 1913(c) (1988), as well as other provisions of the ICWA and the statute's legislative history, demonstrate that

Congress did not intend for a biological parent's right to withdraw consent to the adoption of an "Indian child" to be abrogated "at any time prior to the entry of a final decree of adoption," 25 USC § 1913(c) (1988), even where the child did not qualify as an "Indian child" within the meaning of the ICWA until after the biological parent gave what state law would treat as irrevocable consent to the adoption if an "Indian child" were not involved.

The Quinns also argue that Congress intended the ICWA to apply only in cases in which an "Indian child" is being *removed from* an "Indian cultural setting." They assert further that Walters was not living in an "Indian cultural setting" when Child was born. The Quinns rely on *Adoption of Crews*, 118 Wash 2d 561, 825 P2d 305 (1992). In that case, in holding that the ICWA did not apply to invalidate a final decree terminating parental rights that was entered *before* the child qualified as an "Indian child," the Washington Supreme Court concluded that, in any event, the ICWA was not intended to apply where a child was not part of "an existing Indian family unit or any other Indian community." *Id.* at 569.

That legal argument is not persuasive. The ICWA and its accompanying regulations refer to "protect[ing] and preserv[ing] [] *Indian tribes* and their resources," including their children, 25 USC § 1901(2) (1988) (emphasis added); promoting the "stability and security of *Indian tribes* and families," 25 USC § 1902 (1988) (emphasis added); and preventing "the breakup of Indian families," 25 CFR § 23.3. Those provisions reflect a congressional recognition of tribal rights, apart from the rights of individual parents and children. The ICWA also refers to the necessity of "recogniz[ing] the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," 25 USC § 1901(5) (1988), and the desirability of "*the placement of [Indian] children* in foster or adoptive homes which will reflect the unique values of Indian culture," 25 USC § 1902 (1988) (emphasis added).

Nothing in those or other provisions of the ICWA indicates that any particular quality or quantity of Indian "culture" must be present in order for the provisions to apply, as argued by the Quinns. Neither does the statute

support the Washington Supreme Court's conclusion that the ICWA applies only when the "Indian child" is part of an existing Indian family or Indian community.

The congressional findings, declaration of policy, and substantive standards and procedures set forth in the ICWA demonstrate that Congress intended to afford to Indian children the maximum opportunity to retain their connections to their Indian heritage, without reference to the outward manifestations of that heritage. *See Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 US at 50 n 24 ("[t]he [ICWA] is based on the fundamental assumption that it is in the Indian child's best interests that its relationship *to the tribe* be protected" (emphasis added; internal quotation marks omitted)). Moreover, that protection was intended to benefit the tribes as well as the children themselves. *See id.* at 49 ("Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians"); House Report, *supra,* at 23-24 (the ICWA "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society"; the statute protects "the valuable rights an individual has as a member or potential member of an Indian tribe" and "the rights and interests of an Indian tribe in having its children remain with or become a part of the tribe"); *see also Bryan v. Itasca County,* 426 US 373, 392, 96 S Ct 2102, 48 L Ed 2d 710 (1976) (federal statutes passed for the benefit of Indians must be liberally construed, with doubtful or ambiguous expressions resolved in the Indians' favor). Even aside from the difficulty of identifying an "Indian cultural setting," the fact that a child's connection to its Indian heritage previously has not been manifest or already has become tenuous is a poor reason to allow that connection to be eroded further or dissolved entirely.

In summary, as to the legal issue, the trial court, in my view, erred in ruling that 25 USC § 1913(c) (1988) does not apply because birth mother did not become a member of an Indian tribe until after birth mother gave what Oregon law would treat as irrevocable consent to the adoption if an "Indian child" were not involved. I would hold that, under 25 USC § 1913(c) (1988), birth mother had a right to withdraw

her consent to the adoption of Child if Child qualified as an "Indian child" within the meaning of the ICWA at any time prior to the entry of a final decree of adoption.

I turn now to the factual issue. Because of my disposition of the foregoing legal issue, I conclude that the pertinent factual inquiry for the trial court was whether Child qualified as an "Indian child" within the meaning of the ICWA at any time before entry of the decree of adoption. The majority, in what can only be characterized as a hypertechnical ruling that results in the frustration of the congressional policy underlying the ICWA, holds that birth mother did not present sufficient admissible evidence to establish that Child was an "Indian child" within the meaning of the ICWA. The majority holds that the affidavit is inadmissible hearsay. By applying the rules of evidence to this case as if it were a typical adversary proceeding, the majority reaches a result that is contrary to the purpose and spirit of the ICWA.

In 1978, Congress enacted the ICWA to protect Indian children, Indian parents, and Indian tribes. The ICWA was enacted to "protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." House Report, *supra*, at 23. In the ICWA, Congress declared a federal policy for the best interests of Indian children and the promotion of stable and secure Indian tribal settings. That federal policy is that, "where possible, an Indian child should remain in the Indian community." *Id.*

The legal basis for the ICWA is rooted in the constitutional and plenary power of Congress over Indians, their tribes, and Indian affairs. When a state court has before it a controversy governed by federal substantive law, the court is required to apply the federal law, under compulsion of the Supremacy Clause, Article VI, Clause 2, of the Constitution of the United States, providing that "[t]his Constitution and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the land." *See also* 25 USC § 1901(1) (1988) (Congress finds "that clause 3, section 8, article I of the United States Constitution provides that 'The Congress shall have power . . . to regulate commerce . . . with Indian [T]ribes' and, through this and

other constitutional authority, Congress has plenary power over Indian affairs") (footnote omitted).

Underlying the declaration of policy of the ICWA are congressional findings that an alarmingly high percentage of Indian children were being unnecessarily removed from their families and their culture and placed in a non-Indian environment, and that state courts, in child custody proceedings, "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," 25 USC § 1901 (1988), and thereby deprive many Indian children of their tribal and Indian family life.[4]

To curtail this erosion of the Indian family life, Congress exercised its plenary power over, and responsibility to, Indians and Indian tribes by enacting the ICWA. The ICWA singles out Indian children for particular and special treatment due to the unique historical and political relationship among the United States, Indians, and their tribes.

The ICWA is clearly concerned with the best interests of the "Indian child." However, the phrase "best interests of Indian children" in the context of the ICWA is different than the general Anglo-American "best-interest-of-the-child" standard applicable in adoption cases involving non-Indian children. Under the ICWA, what is best for the "Indian child" is to maintain ties with the Indian tribe, Indian culture, and Indian family. *See Mississippi Choctaw Indian Band v. Holyfield, supra*, 490 US at 50 n 24 ("[t]he [ICWA] is based on the fundamental assumption that it is in the Indian child's best interests that its relationship to the tribe be protected") (internal quotation marks omitted). As one commentator states, "[i]n its strictest sense, the [ICWA]

---

[4]

"The ICWA thus, in the words of the House Report accompanying it, 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' It does so by establishing 'a Federal policy that, where possible, an Indian child should remain in the Indian community,' and by making sure that Indian child welfare determinations are not based on 'a white, middle-class standard, which, in many cases, forecloses placement within [an] Indian family.' " *Mississippi Choctaw Indian Band v. Holyfield, supra*, 490 US at 37 (quoting HR Rep No 1386, 95th Cong, 2d Sess 23-24 (1978), *reprinted in* 6 US Code Cong & Adm News 7530, 7546 (1978)).

trades cultural protection for apparent economic and physical safety." Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test*, 27 Gonzaga L Rev 353, 375 (1991/92).

In applying the ICWA, this court should be cognizant of how traditional Anglo-American state court procedures may contribute to the pattern of discrimination with which Congress was concerned in enacting the ICWA.[5] The Secretary of the Interior,[6] acting through the Bureau of Indian Affairs, has published guidelines for state courts that provide interpretations and assistance in implementing and applying the ICWA. 44 Fed Reg 67584 (1979) (BIA Guidelines).[7]

Although the BIA Guidelines do not have binding legislative effect, the BIA Guidelines represent what the Bureau of Indian Affairs believes is required to ensure that the rights accorded under the ICWA are protected when state courts decide Indian child custody matters:

> "Although rulemaking procedures of the Administrative Procedures Act have been followed in developing these guidelines, they are not published as regulations because they are not intended to have binding legislative effect. Many of these guidelines represent the interpretation of the Interior Department of certain provisions of the [ICWA]. Other guidelines provide procedures which, if followed, will help assure that rights guaranteed by the [ICWA] are protected when state courts decide Indian child custody matters. To the extent that the Department's interpretations are correct, contrary interpretations by the courts would be violations of the [ICWA]." 44 Fed Reg 67584 (1979).[8]

---

[5] Indeed, considering this court's recent study of ethnic and racial bias in the courts, one would expect this court to pay greater attention to biases that may be inherent in our procedures and view of litigation. *See* Report of the Oregon Supreme Court Task Force on Racial/Ethnic Issues in the Judicial System (May 1994) (discussing problems concerning racial and ethnic bias in Oregon courts).

[6] The ICWA authorizes the Secretary of the Interior to promulgate "such rules and regulations as may be necessary to carry out the provisions" of the ICWA. 25 USC § 1952 (1988).

[7] The contents of the Federal Register are required to be judicially noticed. 44 USC § 1507 (1988). *See also* OEC 202 (addressing judicial notice of law).

[8] Of course, states are free to enact laws that provide even greater protection for the rights accorded under the ICWA.

The BIA Guidelines are essential to correctly apply the ICWA:

> "Congress through the [ICWA] has expressed its clear preference for keeping Indian children with their families * * *. Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences. The [ICWA], the federal regulations implementing the Act, the recommended guidelines and any state statutes, regulations or rules promulgated to implement the Act shall be liberally construed in favor of a result that is consistent with these preferences." BIA Guideline A(1), 44 Fed Reg 67585-86 (1979).

Indeed, several state courts consult the BIA Guidelines on matters of procedure under the ICWA. *See, e.g., D. E. D. v. State*, 704 P2d 774, 779 n 8 (Alaska 1985) (while not binding on state courts, the BIA Guidelines are instructive); *Matter of Appeal in Maricopa County*, 136 Ariz 528, 532 n 4, 667 P2d 228 (App 1983) (the BIA Guidelines are a useful source of information for questions that frequently arise over implementation of the ICWA); *In re Junious M.*, 144 Cal App 3d 786, 792 n 7, 193 Cal Rptr 40 (1983) (BIA Guidelines are entitled to great weight); *Matter of J. L. H.*, 299 NW2d 812, 815 (SD 1980) (BIA Guidelines represent the Department of Interior's interpretation of the ICWA). In my view, this court should carefully consider any of the BIA Guidelines that would further the congressional intent of the ICWA and interests of Oregon adoption law.

The BIA Guidelines unequivocally state that, "[w]hen a state court has reason to believe a child involved in a child custody proceeding is an Indian [child], *the court shall seek verification of the child's status either from the Bureau of Indian Affairs or the child's tribe*." BIA Guideline B.1(a), 44 Fed Reg 67586 (1979) (emphasis added). The Commentary to Guideline B.1 "makes clear that the best source of information on whether a particular child is Indian is the tribe itself" and that "[i]t is the tribe's prerogative to determine membership criteria and to decide who meets those criteria." 44 Fed Reg 67586 (1979). BIA Guideline B.1(b)(i) provides that a determination by the tribe that the child is or is not a member of that tribe, is or is not eligible for membership, or that the biological parent is or is not a member of that tribe is conclusive on the issue. 44 Fed Reg 67586 (1979).

The quoted portions of the BIA Guidelines and Commentary issued by the Bureau of Indian Affairs support a pretrial requirement that the court shall inquire of the child's tribe or the Bureau of Indian Affairs if circumstances give the court reason to believe a child to be an "Indian child." At least one other court has supported this interpretation of the ICWA, holding that the court shall inquire if it has reason to believe that the child involved in the child custody proceeding may be an "Indian child." *In re Junious M., supra.*

Obligating the trial court to make the pretrial inquiry of the child's status if it has reason to believe that a child is an "Indian child" is consistent with the approach of the Bureau of Indian Affairs, the federal agency held responsible for implementing the ICWA. It is consistent with legislative intent reflected by ORS 109.350, which states, *inter alia*, that a decree of adoption shall be made if "the court is satisfied * * * that, if applicable, the requirements of the [ICWA] have been met." It is also consistent with the principle that if the state procedural rule is regarded as unduly restricting a litigant's opportunity to assert his or her federal claim, it may be displaced by federal standards. *See Dice v. Akron, C. & Y. R. Co.*, 342 US 359, 363, 72 S Ct 312, 96 L Ed 398 (1952) (jury trial); *Brown v. Western R. of Alabama*, 338 US 294, 296, 70 S Ct 105, 94 L Ed 100 (1949) (a "federal right cannot be defeated by the forms of local practice").

More importantly, requiring the trial court to make the pretrial inquiry as to the status of the child is in harmony with the expansive approach of the ICWA, which, as previously noted, aims to include Indian children wherever feasible and to protect the rights of Indian tribes.[9] Because interests beyond those of the immediate parties and the child are at stake, the ICWA places on courts an independent responsibility to protect the interests of Indian tribes. To

---

[9] The ICWA enforces the policy of protecting against removal of Indian children from the Indian community essentially in six ways: (1) the ability of the Indian parent to revoke consent, 25 USC § 1913(c) (1988); (2) exclusive tribal court jurisdiction under certain circumstances, 25 USC § 1911(a) (1988); (3) concurrent tribal jurisdiction with state court under other circumstances, 25 USC § 1911(b) (1988); (4) a two-year period in which an Indian parent may attempt to nullify an adoption on grounds of fraud and duress, 25 USC § 1913(d) (1988); (5) the ability of the tribe to intervene in a state court proceeding, 25 USC § 1911(c) (1988); and (6) priority in the placement of Indian children with members of the tribe, 25 USC § 1915(a) (1988).

protect the interests of Indian tribes, a court should seek verification from the Indian tribe or the Bureau of Indian Affairs when it has reason to believe that a child is an "Indian child." As the commentary to BIA Guideline B.1 states, "the best source of information on whether a particular child is Indian is the tribe itself." For a court to make a determination as to the applicability of the ICWA exclusively on the basis of evidence submitted by the parties could allow parties, through oversight or otherwise, to defeat the congressional policy underlying the ICWA.

Requiring the court to seek pretrial verification of a child's status is consistent with the court's traditional role in adoption proceedings. Generally, an adoption proceeding is not a typical adversary proceeding in which the court is called upon to declare one of the litigants to be a prevailing party. Rather, the court in an adoption proceeding plays a role that involves determining what is in the best interests of the child. *See Eder v. West*, 312 Or 244, 261, 821 P2d 400 (1991) (discussing nature of an adoption proceeding). Consequently, in adoption and child custody proceedings, courts regularly intercede, ordering parties and agencies to produce information and provide services to children.

Requiring verification by the trial court of a child's possible status as an "Indian child" is consistent with Oregon adoption law as well. ORS 109.350 provides that the trial court shall enter a final decree of adoption only if *"the court is satisfied * * * that, if applicable, the requirements of the* [ICWA] have been met." (Emphasis added.) That statute, in my view, places a requirement on an Oregon trial court, independent of the rules of evidence, in adoption proceedings. In my view, when circumstances give an Oregon court reason to believe that a child in an adoption proceeding may qualify as an "Indian child," the court should inquire of the child's tribe or the Bureau of Indian Affairs to seek verification of the child's possible status as an "Indian child."

BIA Guideline B.1(c) lists some non-exclusive circumstances under which a state court has reason to believe that a child involved in a child custody proceeding may qualify as an "Indian child." One of those circumstances is when "[a]ny party to the case, Indian tribe, Indian organization or

public or private agency informs the court that the child is an Indian child." BIA Guideline B.1(c), 44 Fed Reg 67586 (1979).

In this case, the trial court had reason to believe that Child may qualify as an "Indian child." On April 22, 1991, 13 days after the birth of Child, birth mother filed in the adoption proceeding a document entitled "Revocation of Consent to Adoption," in which she stated:

> "The provisions of the Indian Child Welfare Act[, 25 USC § 1901 *et seq* (1988),] do apply to the minor child in that the child's maternal great-grandfather is an enrolled and full-blooded member of the Cherokee Indian Tribe and I am now advised that I may also be an enrolled member of the said tribe."

It is not disputed that the parties knew of birth mother's Cherokee heritage before the adoption.[10] Moreover, the "Affidavit" of the "Registrar of the Cherokee Nation of Oklahoma," which the trial court admitted over a hearsay objection, and which the majority today holds was inadmissible hearsay,[11] gave the trial court reason to believe that Child qualifies as an "Indian child":

---

[10] As the majority states, in December 1990, the Quinns' lawyer, knowing of birth mother's Cherokee heritage, inquired of the Cherokee Nation in Tahlequah, Oklahoma, whether birth mother's paternal grandmother, Lela Fay Brewer Walters, was an enrolled member of that tribe. The Quinns' lawyer received a negative response. The Quinns' lawyer had not discovered at that time that birth mother's grandfather and great-grandmother were registered members of the tribe. However, the trial court did find that the Quinns' lawyer was informed before the adoption that the Quinns' lawyer had searched the wrong names, but did not follow through in searching the correct names.

[11] Birth mother attempted to prove that Child is an "Indian child" under USC § 1903(4) (1988) of the ICWA by an affidavit of the registrar of the Cherokee Nation of Oklahoma. That affidavit contains the registrar's statement that the tribal registration records state that birth mother is a member of the Cherokee Nation of Oklahoma and "any biological child of [birth mother] is eligible for membership in the Cherokee Nation of Oklahoma."

The registrar's affidavit offered for the truth of its contents is hearsay because it was prepared out of court. Because the affidavit is based on data derived from other sources (the tribal registration records), which is offered also for its truth, the affidavit is double hearsay. OEC 805 requires that both the affidavit and the statements in the tribal registration record qualify under an exception to the hearsay rule. On this record, there is no showing that the registrar's affidavit meets a hearsay exception.

"SS: STATE OF OKLAHOMA
COUNTY OF CHEROKEE

*"AFFIDAVIT*

"BEFORE ME, the undersigned authority, on this day personally appeared R. Lee Fleming, known by me to be the person whose signature I affixed below, and after by me being duly sworn under oath the following:

" 'My name is R. Lee Fleming. I am the Registrar of the Cherokee Nation of Oklahoma. I am charged with the maintenance and inspection of tribal registration records and have custody and control of said records. I hereby swear that I have examined said records and John Lige Wallace Walters, Jr., DOB: 12-26-53, is a duly registered member of the Cherokee Nation of Oklahoma holding Cherokee Registry Number C0125891. And further Tribal records indicate Maki Olivia Walters, DOB: 3-10-76, is a duly registered member of the Cherokee Nation of Oklahoma holding Cherokee Registry Number C0125892 and is a biological child of John Lige Wallace Walters, Jr. Therefore, any biological child of Maki Olivia Walters is eligible for membership in the Cherokee Nation of Oklahoma.' "

Both Oregon and federal law express special concerns about preserving and maintaining the identity of Native American tribes. On this record, the trial court had to be aware that there was a substantial risk that, in permitting the adoption, it would be thwarting those concerns. The trial court should have sought verification from the Cherokee Nation of Oklahoma or the Bureau of Indian Affairs to settle the question whether Child qualified as an "Indian child" under the ICWA before rendering its decision.

An aspect of the child's best interest is the effect of protracted litigation on the child's well-being. Delays in determining the status of a child's relationship, whether with biological or adoptive parties, can complicate a child's adjustment to its new environment. It is vital for children that placement decisions be made as soon and as permanently as possible. To avoid irreparable psychological injury, placement, when in dispute, must be treated as an emergency. The child and the parties have a right to a timely disposition in a child custody case.

The present case was brought into court on April 10, 1991. On April 22, 1991, when Child was 13 days old, birth mother informed the court that Child qualified as an "Indian child." About three and one-half years have elapsed since that time. That is too long to hold a child's placement in limbo. A pretrial verification by the court of Child's status in this case undoubtedly would have resulted in a much earlier resolution of this adoption proceeding.[12]

For the reasons discussed above, even though the affidavit of the registrar of the Cherokee Nation of Oklahoma was inadmissible hearsay, the trial court should not have entered the decree of adoption in this case. I would remand the case to the trial court to require it to seek verification of Child's status, either from the Cherokee Nation of Oklahoma or from the Bureau of Indian Affairs, and for such other proceedings not inconsistent with this dissenting opinion. If, on remand, the trial court were to determine that Child qualified as an "Indian child" within the meaning of the ICWA before the entry of the final decree of adoption, then 25 USC § 1913(c) (1988), on its face, would apply to the adoption proceeding in this case. That is, birth mother would be entitled to withdraw her consent to the adoption "for any reason at any time prior to the entry of a final decree of * * * adoption," as she attempted to do. 25 USC § 1913(c) (1988).

For the foregoing reasons, I would affirm the decision of the Court of Appeals, but for different reasons. I would vacate the decree of adoption and remand the case to the circuit court for further proceedings.

I respectfully dissent.

Fadeley, J., joins in this dissenting opinion.

---

[12] In *Mississippi Choctaw Indian Band v. Holyfield, supra*, the Supreme Court of the United States, faced with a similar passage of time, stated:

"We are not unaware that over three years have passed since the twin babies were born and placed in the [adoptive] home * * *. Three years' development of family ties cannot be undone, and a separation at this point would doubtless cause considerable pain.

"* * * *Had the mandate of the ICWA been followed in 1986, of course, much potential anguish might have been avoided,* and in any case the law cannot be applied so as automatically to 'reward those who obtain custody whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation.'" 490 US at 53 (quoting *Matter of Adoption of Halloway*, 732 P2d 962, 972 (Utah 1986)). (Emphasis added.)