933 P.2d 993 (1997)
STATE of Utah, in the Interest of D.A.C., P.D.C., and S.D.C., persons under eighteen years of age.
D.J.C., Petitioner and Appellee,
v.
P.D.C., Respondent and Appellant.
No. 950573-CA.
Court of Appeals of Utah.
February 27, 1997.
*994 Cindy Barton-Coombs, Roosevelt, for Respondent-Appellant.
John C. Beaslin, Vernal, for Petitioner-Appellee Cleve J. Hatch, Vernal, Guardian Ad Litem.
Before DAVIS, BILLINGS and GREENWOOD, JJ.

*995 OPINION
BILLINGS, Judge:
P.D.C. (Father) appeals the juvenile court's termination of his parental rights in his three children. Father contends the action should have been transferred to tribal court under the Indian Child Welfare Act of 1978 (ICWA) and that ICWA standards applicable to termination of parental rights to an Indian child were not met. We affirm in part and reverse and remand in part.

FACTS
D.J.C.R. (Mother) and D.R.R. (Stepfather) petitioned to have Mother's three children, D.A.C. and P.D.C., fourteen-year-old twins, and S.D.C., seven years old, adopted by Stepfather. Mother then petitioned to terminate Father's parental rights.
Father and all three children are enrolled members of the Eastern Shoshone Tribe (Tribe). However, the children have never lived on or near the Tribe's reservation. Until 1989, when Mother and Father divorced, the family maintained its domicile in Vernal, Utah. In the divorce decree, Mother was granted custody of the children subject to Father's reasonable visitation rights, and Father was ordered to pay monthly child support. Mother has no Indian heritage nor does Stepfather, whom she married in 1990.
Father moved to transfer the termination of parental rights proceeding to tribal court pursuant to ICWA. See 25 U.S.C. § 1911(b) (1983). Mother objected to the transfer. The court allowed the Tribe to intervene in the case, but denied removal to tribal court. The juvenile court retained jurisdiction, noting Mother's objection and finding good cause not to transfer the case, and the case proceeded to trial.
At trial, it was shown that Father has a history of violent behavior. On numerous occasions, Father threatened Mother with physical harm, including threatening to kill her. Father also has failed to pay child support. Father has been incarcerated three times since the birth of the older children, most recently from 1990 to 1994 for felony assault against Mother. This conviction resulted from an incident when Father broke into Mother's home and physically assaulted her. S.D.C., then age three, witnessed this assault and was knocked to the ground from Mother's arms during it. Father also habitually and excessively used alcohol and controlled substances and was inebriated at times in the children's presence.
Based upon the above facts, the juvenile court terminated Father's parental rights under state law. The court concluded ICWA did not apply to this termination proceeding because there was no existing Indian family as contemplated by the policies underlying ICWA.
Father appealed, and the juvenile court granted Father's motion to stay the adoption proceedings pending appeal. Specifically, Father appeals the court's refusal to transfer the case to tribal court and the court's conclusion that ICWA was not applicable to this proceeding. He argues that if the juvenile court had applied the provisions of ICWA, Mother would not have met her burden to terminate his parental rights, and we therefore should reverse the juvenile court's order.

ANALYSIS

I. Transfer to Tribal Court
Father contends the juvenile court erred in refusing to transfer this termination of parental rights proceeding to tribal court pursuant to ICWA, 25 U.S.C. § 1911(b) (1983).
Under ICWA, tribal courts have exclusive jurisdiction over child custody proceedings[1] involving Indian children[2] domiciled on a reservation. Id. § 1911(a). However, ICWA *996 creates concurrent, but presumptively tribal, jurisdiction in proceedings involving Indian children not domiciled on a reservation. Id. § 1911(b). Section 1911(b) provides:
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.
Id.
Although Father admits the United States House of Representatives' Report on section 1911(b) states that "either parent is given the right to veto" transfer of jurisdiction to tribal court, he contends the section does not give either parent an absolute veto over the transfer of jurisdiction. To determine whether section 1911(b)'s language is intended to create an absolute veto, we examine the administrative guidelines and relevant case law.
The Bureau of Indian Affairs has promulgated nonbinding guidelines to assist in interpreting section 1911(b) as follows:
Upon receipt of a petition to transfer by a parent, Indian custodian or the Indian child's tribe, the court must transfer unless either parent objects to such transfer, the tribal court declines jurisdiction, or the court determines good cause to the contrary exists for denying the transfer.
....
Since the Act gives the parents and the tribal court of the Indian child's tribe an absolute veto over transfers, there is no need for any adversary proceedings if the parents or the tribal court opposes transfer.
Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,590-91 (1979) (not codified) (emphasis added) (BIA Guidelines).
The United States Supreme Court has also referred to a parent's veto power as follows:
Section 1911(b) ... creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of `good cause,' objection by either parent, or declination of jurisdiction by the tribal court.
Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 36, 109 S.Ct. 1597, 1601-02, 104 L.Ed.2d 29 (1989) (emphasis added).
Additionally, several of our sister states have interpreted section 1911(b) as giving parents an absolute veto over transfer of jurisdiction. See, e.g., In re Appeal in Maricopa County, 186 Ariz. 354, 922 P.2d 319, 321-22 (App.1996) ("Consistent with uniform authority, this court has held that, under § 1911(b), a parent's `objection mandate[s] the retention of jurisdiction.'" (citation omitted)); In re Larissa G., 43 Cal.App.4th 505, 51 Cal.Rptr.2d 16, 22 (1996) (concluding plain language allowing parental objection to transfer is supported by administrative guidelines and policy of ICWA); In re Adoption of S.S., 167 Ill.2d 250, 212 Ill.Dec. 590, 657 N.E.2d 935, 940, 942 (1995) (stating transfer can occur only absent parental objection); In re Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168, 178 (1982) (holding parent's clear objection to transfer proscribes transfer); In re Laurie R., 107 N.M. 529, 760 P.2d 1295, 1299 (Ct.App.1988) (interpreting guidelines to mean State must transfer unless either parent objects); In re Spang, no. 95-2, 1995 WL 776051, at *2 (Ohio.Ct.App. Dec.26, 1995) (holding mother's express objection to transfer "sufficient under the statute to negate the transfer"); In re S.Z., 325 N.W.2d 53, 56 (S.D.1982) ("This statute [section 1911(b)] provides that objection by either parent will keep jurisdiction in the state court.").
In the present case, the juvenile court, although recognizing the clear language of section 1911(b) and the BIA Guidelines, determined it was not necessary for it to decide whether an objection by one parent to the transfer of jurisdiction was an absolute *997 veto because good cause existed to retain the proceeding in state court. Because we may affirm on any proper ground and to give direction in subsequent proceedings, we take this opportunity to adopt the majority view that the plain language of section 1911(b) allows parents of Indian children domiciled off a reservation an absolute veto over transfer of jurisdiction to tribal courts.[3] Accordingly, we uphold the trial court's retention of jurisdiction.

II. Application of ICWA to Termination Proceedings
Next, Father appeals the juvenile court's determination that ICWA did not apply in his termination of parental rights proceeding because "the termination of [Father]'s parental rights will not result in the break-up of an Indian family."
In order to (1) "protect the best interests of Indian children" and (2) "promote the stability and security" of Indian children, tribes, and families, Congress passed ICWA to establish "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902 (1983).[4] To implement these policy goals in Indian child custody proceedings occurring in state court, ICWA provides substantive and procedural safeguards that must be met in addition to state law standards. See, e.g., id. § 1912.
The instant case presents us with the termination of an Indian father's parental rights in his Indian children. A termination of parental rights proceeding[5] is included under ICWA's definition of child custody proceedings. Id. § 1903(1). Further, ICWA defines an "Indian child" as any unmarried person under the age of eighteen who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. Id. § 1903(4).
*998 Nevertheless, the juvenile court adopted a judicially-created "existing Indian family" exception, concluding that ICWA did not apply to this otherwise statutorily covered child custody proceeding because the children were not part of an existing Indian family, and thus, the proceeding would not result in the breakup of an existing Indian family.

A. Existing Indian Family Doctrine
Whether the "existing Indian family" doctrine provides an exception to ICWA coverage is an issue of first impression for Utah courts. Whether there is a threshold requirement of an "Indian family" in order to apply ICWA is a question of law, In re Baby Boy Doe, 123 Idaho 464, 849 P.2d 925, 931 (1993), which we review for correctness.
Our sister states are significantly split on the application of the existing Indian family doctrine.[6] The fundamental difference between the jurisdictions is that those in favor of the doctrine see it as a policy prerequisite to application of ICWA, while those in opposition to the doctrine consider it an impermissible, judicially-created exception contrary to ICWA's plain language.
The existing Indian family doctrine was first adopted by the Kansas Supreme Court, which determined ICWA did not apply to an adoption proceeding involving a non-Indian mother's illegitimate child, who had never been in the care or custody of the Indian father. In re Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168, 176 (1982). The Kansas Supreme Court explained:
A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes.... It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother.
Id. 643 P.2d at 175.
Oklahoma adopted and applied this doctrine in a case more similar to the case at bar. In In re Adoption of D.M.J., 741 P.2d 1386, 1387 (Okla.1985), a non-Indian mother was placing her Indian child for adoption six years after she and the child's Indian father divorced. Applying substantially the same analysis used in Adoption of Baby Boy L., the court concluded, where the child had been in the custody of her non-Indian mother for six years, the child was not being removed from the custody of an Indian parent or environment and, therefore, ICWA did not apply. Id. at 1389.
In contrast, the Alaska Supreme Court rejected the existing Indian family doctrine in A.B.M. v. M.H., 651 P.2d 1170, 1173 (Alaska 1982). The A.B.M. court refused to adopt the existing Indian family doctrine where an Indian child was adopted by the mother's sister and brother-in-law and the mother later sought to revoke her consent to the adoption. Id. at 1171, 1173-74. The adoptive parents, who were also Indian, argued that because ICWA was intended to prevent bias "in the removal of Indian children from their cultural settings," it did not apply to the facts of their case. Id. at 1173. Although the court agreed that the adoptive parents had identified "one of the primary purposes of the Act" and that application of ICWA was not necessary to preserve the child's Indian culture, the court ruled it could not "justify creating a judicial exception to the Act's coverage *999 on this basis alone." Id. Therefore, the court refused to limit ICWA's application.
The Oregon Court of Appeals, in In re Adoption of Quinn, 117 Or.App. 579, 845 P.2d 206, 209 (1993), provided additional policy reasons for rejecting the doctrine's presumption that ICWA does not apply when a child is not being removed from an existing Indian cultural setting. The Quinn court concluded the doctrine was directly in conflict with the idea of tribal sovereignty and the policy of improving tribal ties reflected in ICWA. Id. 845 P.2d at 208. Further, the court stated the doctrine, in allowing a state court to determine whether there is an existing Indian family or cultural setting, permits exactly the type of state court interference ICWA was intended to protect against. Id. 845 P.2d at 208-09 & n. 2.
Engrafting a new requirement into ICWA that allows the dominant society to judge whether the parent's cultural background meets its view of what "Indian culture" should be puts the state courts right back into the position from which Congress has removed them. That would be especially ironic, in that one of the reasons that the parents may not be involved in their Indian culture could be the very policies of removal of Indian children that ICWA was intended to counteract. If state courts impose their own value system on these decisions, the tribes will never be able to regain members who have been lost because of earlier government policies.
Id. (citation omitted).
The rationale of the courts refusing to apply this judicially-fashioned exception to ICWA is buttressed by the Supreme Court's decision in Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). In Holyfield, two unwed Indian parents, who resided on a reservation, traveled off the reservation for the birth of their twins and made plans for their children to be adopted by a non-Indian family. Id. at 37, 109 S.Ct. at 1602. After the births, the parents consented to the adoption. The tribe moved to vacate the adoption, claiming the state court did not have jurisdiction under ICWA. Id. at 38, 109 S.Ct. at 1603.
Construing the ICWA provision vesting exclusive jurisdiction in the tribe for custody proceedings involving Indian children residing or "domiciled" on the reservation, the Court concluded federal law preempts state law in determining the definition of domicile. Id. at 48, 109 S.Ct. at 1608. Therefore, the Court held the children's domicile was the reservation because the mother intended to return to the reservation after she gave birth to the children, and thus the tribe had exclusive jurisdiction. Id. at 48-49, 109 S.Ct. at 1608-09.
The Holyfield Court further justified its decision by noting the tribe's interest in Indian children is equal to those of the parents: "Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." Id. at 49, 109 S.Ct. at 1608-09. Accordingly, the specific statutory language placing exclusive jurisdiction with the tribe prevailed over the parents' interest in placing their children for adoption with non-Indians.
The Court's emphasis on the tribe's separate interest in Indian children has led some courts to hold the decision impliedly overruled the existing Indian family doctrine. The Idaho Supreme Court concluded Holyfield impliedly overruled the existing Indian family doctrine because it applied the jurisdictional provisions of ICWA to children who "had never been on the reservation, with their Indian parents, or within the Indian culture." Baby Boy Doe, 849 P.2d at 931; see also In re Crystal K., 226 Cal.App.3d 655, 276 Cal.Rptr. 619, 625 (1990); In re Elliott, 218 Mich.App. 196, 554 N.W.2d 32, 36-37 (1996); Quinn, 845 P.2d at 208-09.
We find the reasoning of the courts rejecting the judicially-created existing Indian family doctrine more persuasive. ICWA is detailed and clearly covers these Indian children and this termination proceeding.[7] *1000 Congress created exceptions to application of ICWA for juvenile delinquency and divorce custody proceedings. Thus, Congress made policy decisions to limit application in other circumstances, but not in this situation. The policies of the Act require its application not just to preserve an Indian parent's rights, or an Indian family, but also the tribe's interest in its children. These policies are frustrated by the adoption of the existing Indian family exception. In sum, it is for Congress to decide when this Act will apply and Congress has clearly stated ICWA should apply in this case. Therefore, we conclude the trial court erred in determining ICWA did not apply in this termination of parental rights proceeding even though Father and his three children are Indians.

B. Intra-Family Custody Disputes
Mother also argues we should not apply ICWA because this case involves an intra-family dispute rather than a state agency removing a child. This is also an issue of first impression in Utah with a split of authority among our sister jurisdictions.
ICWA defines covered child custody proceedings to include foster care placements, termination of parental rights, preadoptive placements, and adoptive placements. 25 U.S.C. § 1903(1) (1983). It also specifically excepts two types of custody proceedings: placements as a result of juvenile delinquency and custody placements during a divorce proceeding. Id.
With respect to determining whether placement is covered by ICWA, the BIA Guidelines state only that "child custody disputes arising in the context of divorce or separation proceedings or similar domestic relations proceedings are not covered by the Act so long as custody is awarded to one of the parents." BIA Guidelines, 44 Fed.Reg. 67,587 (1979).
Mother relies on the seminal case In re Bertelson, 189 Mont. 524, 617 P.2d 121 (1980), to assert ICWA does not apply to intra-family custody disputes. Bertelson involved a custody dispute between a non-Indian mother and the child's Indian paternal grandparents, to whom the mother had given physical custody of her child. Id. 617 P.2d at 124. The court concluded "the dispute does not fall within the ambit of" ICWA, reasoning:
The Act is not directed at disputes between Indian families regarding custody of Indian children; rather, its intent is to preserve Indian culture values under circumstances in which an Indian child is placed in a foster home or other protective institution. The House Report sets forth the essential thrust of the act:
"... to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal Standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes or institutions which will reflect the unique values of Indian culture."
The issue here is not which foster or adoptive homes or institution will best "reflect the unique values of Indian culture...." Rather, the present case involves an internal family dispute between the mother and the paternal grandparents over the custody of the child.
Id. 617 P.2d at 125-26 (citation omitted).[8]
Most courts have criticized and expressly refused to follow the Bertelson analysis, concluding it is an inappropriate judicially-created exception to ICWA. See, e.g., A.B.M., 651 P.2d at 1173; In re Crystal K., 226 Cal. App.3d 655, 276 Cal.Rptr. 619, 625 (1990); In re Custody of A.K.H., 502 N.W.2d 790, 794 (Minn.App.1993); In re Q.G.M., 808 P.2d 684, 685-86 & n. 2 (Okla.1991); In re Custody of S.B.R., 43 Wash.App. 622, 719 P.2d 154, 156 (1986). The cases rejecting Bertelson's reliance on the policy provision of the Act reason that Congress delineated two specific exceptions, *1001 and under basic rules of statutory construction, express exceptions exclude all other exceptions. See, e.g., S.B.R., 719 P.2d at 156.
We agree with the rationale of the courts applying ICWA to intra-family disputes. The language defining child custody proceedings clearly provides for only two exceptions. The exception for child custody matters in a divorce is not analogous to a termination of parental rights proceeding. This case involves a proceeding in juvenile court with permanent consequences to the parent-child relationship. Therefore, we conclude ICWA is applicable in the present case.

III. Termination of Parental Rights

A. State Law Standards
Father argues that even using state law standards, the court erred in terminating his parental rights. Section 78-3a-407 of the Utah Code provides as grounds for termination of parental rights parental unfitness or incompetence and only token efforts to support or communicate with the child. Utah Code Ann. § 78-3a-407 (Supp.1996).
In determining whether a parent or parents are unfit or have neglected a child the court shall consider, but is not limited to, the following conditions:
. . . .
(b) conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature;
(c) habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child;
(d) repeated or continuous failure to provide the child with adequate food, clothing, shelter, education, or other care necessary for his physical, mental, and emotional health and development
. . .;
. . . .
(f) a history of violent behavior.
Id. § 78-3a-408(2) (emphasis added).
A review of the record demonstrates the juvenile court had clear and convincing evidence to terminate Father's parental rights under state law. Father has a history of violent behavior. On numerous occasions, Father threatened Mother with physical harm, including threatening to kill her. Father also has failed to pay child support. Father has been incarcerated three times since the birth of the older children, most recently from 1990 to 1994 for felony assault against Mother. S.D.C., then age three, witnessed this assault and was knocked to the ground from Mother's arms during it.
Moreover, the children were emotionally upset by Father's abuse of Mother. Both of the twins testified that they were afraid of Father. D.P.C. testified that Father had mentally, but not physically, abused him. S.D.C., the younger child, could recall the incident when Father abused Mother, knocked her down, and tried to leave with her. Also, the children's maternal grandfather testified the children have told him they are afraid of what Father might do. He testified the children also have incidents of bedwetting  and one of the twins has been incontinent at school  when Father is around or when they know he might be around.
Therefore, we affirm the state law grounds for termination of Father's parental rights.

B. Termination Under ICWA
Finally, Father claims we must reverse the termination of his parental rights because the juvenile court erred in not requiring Mother to prove the additional elements required under ICWA. Mother responds that we can affirm as the standards of ICWA were satisfied. ICWA provides:
Any party seeking ... termination of parental rights to an Indian child under State law shall satisfy the Court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break up of the Indian family and that these efforts have proved unsuccessful.

*1002 . . . .
No termination of parental rights may be ordered in such proceedings in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 U.S.C. § 1912(d), (f) (1983). This court has determined the specific findings required under ICWA must be proven "in addition to those required by state law" and under the higher, beyond a reasonable doubt, standard of proof. State ex rel. S.A.E., 912 P.2d 1002, 1004 (Utah App.1996). This court has also clarified that it is the question of whether or not serious damage to the child is likely to occur that requires qualified expert testimony. Id. (quoting BIA Guidelines, 44 Fed. Reg. 67,584, 67,593 (1979)).

1. Remedial Efforts
The children's Guardian ad Litem points out that the parties stipulated that the remedial measures provision of ICWA had been met. At the hearing on the Tribe's motion to transfer jurisdiction, the court stated the parties had stipulated in chambers that
should this matter be heard by the state court ... the substantive standards set forth in the [ICWA] would apply to this proceeding and that would be the grounds as defined in that Act. The burden of proof, which would be beyond a reasonable doubt, and the requirement that active efforts have been made to provide remedial services and rehabilitative programs to [Father] has been unsuccessful.
This record acknowledgment of the stipulation eliminates this issue.

2. Continued Custody
In this case, although Mother had physical custody, the couple's divorce decree granted Father reasonable visitation rights. Therefore, we must determine whether Mother proved beyond a reasonable doubt that Father's continued legal rights to reasonable visitation would lead to serious emotional or physical harm of the children.
First, Father contends Mother did not use a qualified expert witness to prove the children would be seriously harmed by Father's legal visitation. Father claims Mother did not move to have her expert witness, Mr. Augustus, qualified as such. However, Father's counsel did not make an objection to the court that Mr. Augustus was not qualified and did not object when Mr. Augustus was giving his opinions regarding the case. Father's failure to object below prevents us from considering this claim on appeal.[9]See Industrial Power Contractors v. Industrial Comm'n, 832 P.2d 477, 479 (Utah App.1992).
Next, Father contends Mr. Augustus did not spend enough time with the children to correctly evaluate the situation in this case. Mr. Augustus read all of the previous court materials and materials from the Guardian ad Litem and interviewed the children, Mother, and the children's maternal grandfather. Based on that preparation, Mr. Augustus testified that he had spent an adequate *1003 amount of time with the case to form an opinion on the children's emotional well-being. Furthermore, Father failed to make his objections before the juvenile court. Therefore, we conclude Mr. Augustus was a qualified expert witness.
Finally, Father argues that Mother did not establish beyond a reasonable doubt that his continued visitation with the children would lead to serious emotional or physical harm as required by ICWA. Mr. Augustus testified that any continued contact with Father would cause the children emotional and physical damage. He stated the children were fearful of having any contact with Father. He also testified that all of the children were emotionally traumatized in their relationship with Father because of the violence they had witnessed. He stated the children only felt safe when Father was in prison, and when Father was not incarcerated, they were frightened that he might take them away from Mother and cause physical harm to Mother or their home. Further, Mr. Augustus opined that because continued contact with Father would retraumatize the children, Father should have no further contact with the children and be restricted from being in the local area. He stated the children view themselves as victims and any further contact would victimize them further.
However, because the juvenile court concluded ICWA was inapplicable to the proceeding, it did not determine whether this evidence met ICWA's standard or its higher standard of proof. Because the trial court is in the best position to make these highly factual determinations, we remand to the juvenile court for a determination of whether Mother proved the ICWA standard for termination, i.e., serious emotional or physical harm, beyond a reasonable doubt.

CONCLUSION
We conclude the juvenile court properly retained jurisdiction because either parent has an absolute veto to the transfer of jurisdiction to a tribal court. However, we reverse the juvenile court's conclusion that the existence of an Indian family is necessary before ICWA can be applied to a child custody proceeding. We also conclude ICWA applies to intra-family disputes. Therefore, the juvenile court should have applied ICWA in this case.
In applying the ICWA standards, we conclude, based on the record, sufficient remedial efforts were made and Mother's expert witness was qualified to testify as to the potential emotional or physical damage Father's continued custody would create. However, we remand to the juvenile court for a determination of whether, as required by ICWA's standards, the evidence at trial demonstrated beyond a reasonable doubt that Father's continued visitation would likely cause the children serious emotional or physical damage. Finally, we affirm the trial court's termination of Father's parental rights under state law.
DAVIS, P.J., and GREENWOOD, J., concur.
NOTES
[1] "Child custody proceeding" is defined as a proceeding involving foster care placements, termination of parental rights, preadoptive placements, and adoptive placements. 25 U.S.C. § 1903(1) (1983). It does not include divorce proceedings granting one parent custody or juvenile delinquency proceedings. Id.
[2] An "Indian child" is defined as "any unmarried person who is under the age of eighteen and is either: (a) a member of an Indian tribe; or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).
[3] Although our determination that a parent has an absolute veto over transfer of jurisdiction renders a determination of good cause unnecessary, we note that the trial court did not abuse its discretion in retaining jurisdiction on this basis. The BIA Guidelines state that "good cause" not to transfer jurisdiction exists when the child's tribe does not have a tribal court or when any of the following circumstances exist:

(i) The proceeding was at an advanced stage when the petition to transfer was received....
(ii) The Indian child is over twelve years of age and objects to the transfer.
(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.
(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.
Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed.Reg. 67,583-84, 67,591 (1979) (not codified); see also In re Adoption of Halloway, 732 P.2d 962, 963 n. 2 (Utah 1986) (using BIA Guidelines to define "good cause").
The juvenile court employed these guidelines and found that the twins, then age fourteen, objected to transfer and that all three children perceived that they were not safe on the reservation. Thus, the court concluded the transfer would be detrimental to the children's physical and emotional well-being and was not in their best interests. The trial court also found that the parties, children, witnesses, and evidence necessary to decide this case were located in Vernal, Utah, which was five hours driving time from the reservation.
[4] Congress also made the following findings to explain the purpose of ICWA's passage:

(2) that Congress ... has assumed the responsibility for the protection and preservation of Indian tribes and their resources;
(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest ... in protecting Indian children who are members of or are eligible for membership in an Indian tribe;
(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.
25 U.S.C. § 1901.
[5] A termination of parental rights proceeding, as we are faced with in this case, is defined to include "any action resulting in the termination of the parent-child relationship." 25 U.S.C. § 1903(1)(ii).
[6] The states adopting the doctrine include Alabama, Indiana, Kansas, Kentucky, Louisiana, Montana, Missouri, Oklahoma, and Washington. See S.A. v. E.J.P., 571 So.2d 1187, 1189 (Ala.Civ. App.1990); In re D.S., 577 N.E.2d 572, 574 (Ind. 1991); In re Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168, 175 (1982); Rye v. Weasel, 934 S.W.2d 257 (1996); Hampton v. J.A.L., 658 So.2d 331, 334-35 (La.Ct.App.1995); In re T.S., 245 Mont. 242, 801 P.2d 77, 82 (1990); In re S.A.M., 703 S.W.2d 603 (Mo.Ct.App.1986); In re S.C., 833 P.2d 1249, 1254-56 (Okla.1992); In re Adoption of Crews, 118 Wash.2d 561, 825 P.2d 305, 308-11 (1992). The states rejecting the doctrine include Alaska, California, Idaho, Michigan, and Oregon. See A.B.M. v. M.H., 651 P.2d 1170, 1173 (Alaska 1982); In re Junious M., 144 Cal.App.3d 786, 193 Cal.Rptr. 40, 46 (1983); In re Baby Boy Doe, 123 Idaho 464, 849 P.2d 925, 931 (1993); In re Elliott, 218 Mich.App. 196, 554 N.W.2d 32, 35-36 (1996); In re Adoption of Quinn, 117 Or.App. 579, 845 P.2d 206, 209 & n. 2 (1993).
[7] ICWA provides: "Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902.
[8] The language the court cites from the House report became the policy provision of ICWA. See 25 U.S.C. § 1902.
[9] The BIA Guidelines list the following characteristics to consider in determining whether a witness qualifies as an expert for purposes of ICWA:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and child rearing practices.
(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and child rearing practices within the Indian child's tribe.
(iii) A professional person having substantial education and experience in the area of his or her specialty.
44 Fed.Reg. at 67,593.
In this case, the expert witness, Mr. Augustus, was a licensed clinical social worker with Master's degrees in social work and sociology. He has been working primarily with children and families since 1970. He has been in private practice in Vernal since 1989. He testified that he had acted as an expert witness in many cases. He also testified that he had counseled many Indian children. Thus, the record reflects Mother's counsel laid a proper foundation to qualify Mr. Augustus as an expert even though he failed to formally move that he be qualified.