IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 22-787

_____

FILED

June 12, 2023

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. THE DELAWARE TRIBE OF INDIANS,
Intervenor below, Petitioner,

v.

THE HONORABLE STACY NOWICKI-ELDRIDGE, Judge of the Circuit Court of
Boone County, K.A. and E.A., Intervening Foster Parents of I.R., A.S., Intervenor and
Prospective Kinship Placement of I.R., M.J.-1 and M.J.-2, Proposed Intervenors and
Prospective Kinship Placement of I.R., B.D., Respondent Father of I.R., and I.R., Subject
Child of the Petition Below,
Respondents.

_____

Petition for a Writ of Prohibition

WRIT GRANTED

_____

Submitted: April 25, 2023
Filed: June 12, 2023

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Aspinwall, Pennsylvania
Counsel for the Petitioner

Patrick Morrisey, Esq.
Attorney General
Andrew T. Waight, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the Respondent DHHR

Matthew M. Hatfield, Esq.
Hatfield & Hatfield, PLLC
Madison, West Virginia
Counsel for Respondent Father B.D.

Allison K. Huson, Esq.

Law Office of Allison K. Huson
Huntington, West Virginia
Counsel for Intervening Foster Parents
K.A. and E.A.

Joseph H. Spano, Jr., Esq.
Pritt & Spano, PLLC
Charleston, West Virginia
Counsel for Intervenor A.S.

Adam Campbell, Esq.
Campbell & Smith PLLC
Charleston, West Virginia
Counsel for Proposed Intervenors M.J.-1
and M.J.-2

Moriah N. Myers, Esq.
Moriah Myers—Huntington
Huntington, West Virginia
Guardian *ad litem*

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ARMSTEAD dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.  These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue.  Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight."  Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).


2.      West Virginia does not recognize the Existing Indian Family exception to the Indian Child Welfare Act, 25 U.S.C. §§ 1901 to -1963 (2021).

i

WOOTON, Justice:

Petitioner, The Delaware Tribe of Indians ("the Tribe"), seeks a writ of prohibition precluding the Circuit Court of Boone County from enforcing its September 30, 2022, order denying the Tribe's motion to transfer the underlying abuse and neglect proceedings to the District Court of the Delaware Tribe ("the tribal court") pursuant to the requirements of the Indian Child Welfare Act ("ICWA" or "the Act"), 25 U.S.C. §§ 1901 to -1963 (2021). In denying the Tribe's motion to transfer the circuit court adopted a minority doctrine known as the Existing Indian Family ("EIF") exception to the ICWA, which posits that the Act only applies when a child is removed from his or her custodial Indian parent or from an existing "Indian family." In the alternative, the circuit court found that if the ICWA applied, good cause existed to deny the Tribe's motion to transfer under 25 U.S.C. section 1911(b). The Tribe challenges each of these conclusions. Upon consideration of the parties' oral arguments and briefs, the appendix record, and applicable authorities we find that the circuit court erred in denying the motion to transfer this action to the tribal court. Accordingly, we grant the requested writ, and remand the case to the circuit court with directions to enter an order transferring this matter to the tribal court.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The underlying abuse and neglect proceedings began in January 2020 when the West Virginia Department of Health and Human Resources ("DHHR") filed an abuse

and neglect petition alleging that I.R.'s[1] mother, K.R. ("the mother"), abused drugs, was homeless, and could not provide for the then thirteen-month-old child, I.R. At the time the petition was filed the identity of I.R.'s father was unknown, but the petition alleged that he had abandoned the child. Upon the filing of the petition the circuit court ordered I.R. removed from the mother's custody. At that time the child was placed with Respondent Foster Parents E.A. and K.A. ("foster parents"). Ultimately the mother stipulated to the allegations of abuse and neglect contained in the petition and was subsequently adjudicated as an abusing and neglectful parent. The circuit court granted the mother a post-adjudicatory improvement period.

The DHHR later moved to revoke the mother's improvement period, noting her lack of compliance with any requirements set out in the case plan. At a hearing convened on July 1, 2020, the circuit court granted the DHHR's motion. The court set a dispositional hearing on the mother's rights for August 5, 2020, and at that hearing ultimately terminated her parental rights to the child.

At the July 1, 2020, hearing counsel for the unknown father moved for paternity testing of Respondent Father B.D. ("Respondent Father"), a putative father of the child. The court granted that motion, and testing confirmed that Respondent Father was

---

[1] Consistent with our practice in cases involving sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015).

the biological father of the child. In a subsequent hearing on January 4, 2021, the circuit court dismissed the unknown father from the case and appointed counsel for Respondent Father. In that order the circuit court found that there were no allegations against Respondent Father and that he was unaware of the child's existence until the time of the paternity test; therefore, he was determined to be a "non-maltreating parent in this matter." Accordingly, the court ordered the DHHR to begin the process of unifying Respondent Father and the child, and to begin supervised visits between the two.

The DHHR began the reunification process but was hindered by Respondent Father B.D.'s residence in the State of Minnesota, which required the DHHR to facilitate reunification via the Interstate Compact for the Placement of Children ("ICPC"). *See* W. Va. Code §§ 49-7-101, 102 (2018). The DHHR submitted its ICPC request to the Minnesota Department of Human Services ("Minnesota DHS") on January 25, 2021, seeking a home study of Respondent Father's home. It is apparent from the record that Respondent Father cancelled his initial home study with the Minnesota DHS and then failed to respond to calls, letters, or text messages from that agency until late March 2021. Finally, he sent a text message to the Minnesota DHS stating that he wished to withdraw from the ICPC process due to ongoing relationship issues and his belief that he was unable to parent I.R. alone. At that time, Respondent Father requested that the Minnesota DHS contact his sister, A.S., about caring for the child.

The DHHR was not formally notified of these developments until April 2021. However, in March 2021 A.S. contacted the DHHR to inquire about placement of the child. Thereafter a multidisciplinary team ("MDT") meeting convened, at which A.S. was present. At the meeting the DHHR advised all parties that I.R. had been in foster care for approximately fourteen months and had bonded to her foster family. Nevertheless, the DHHR submitted an ICPC request to the Minnesota DHS in April 2021 requesting an evaluation of A.S. The DHHR also began supervised visits between A.S. and the child.

In December 2021, A.S. moved to intervene in the abuse and neglect proceedings as a possible kinship placement for I.R., and Respondent Father informed the DHHR that he was a member of the Tribe. However, when the DHHR requested verification—specifically, a copy of Respondent Father's tribal membership card—Respondent Father indicated that the card was lost. During December 2021 the Tribe became aware of these proceedings.[2]

---

[2] The appendix record is largely devoid of any information regarding the period from April 2021 to December 2021, but the parties agree that efforts were underway to place I.R. with either A.S. or the proposed-intervenor cousins, M.J.-1 and M.J.-2. No hearings were held before the circuit court during that time.

Further, the record does not indicate how the Tribe came to be notified of these proceedings in December 2021, but it is undisputed that such notification did not come from the DHHR. Despite this, we have no trouble concluding that the Tribe had actual notice of the proceedings from December 2021 onward. *See In re N.R.*, 242 W. Va. 581, 590, 836 S.E.2d 799, 808 (2019) (explaining that actual notice constitutes substantial compliance with the notice requirements of the ICWA at 25 U.S.C. § 1912(a)).

4

In January 2022, the DHHR filed an amended abuse and neglect petition alleging that Respondent Father abandoned the child insofar as he withdrew from the ICPC process and ceased communications with the DHHR. The parties then convened for an MDT meeting to address these allegations, as well as concerns the DHHR had with A.S.'s ICPC report.[3] At the MDT meeting Respondent Father indicated that he wished to voluntarily relinquish his parental rights.

The circuit court convened a hearing on January 31, 2022, at which it granted A.S.'s motion to intervene, as well as a pending motion to intervene from the foster parents. At this hearing Respondent Father requested that the DHHR withdraw the amended abuse and neglect petition so he could complete the process of voluntarily relinquishing his parental rights. The DHHR agreed to do so, and subsequently withdrew the amended petition.

The DHHR filed a second amended petition on March 1, 2022, after Respondent Father failed to complete the voluntary relinquishment process. The second amended petition included the same allegations: that Respondent Father had abandoned the

---

[3] The Minnesota DHS approved A.S. as a "relative-unlicensed caregiver" but the report failed to include a background check on A.S.'s husband. The DHHR found this troubling, given A.S.'s prior disclosure that her husband had a criminal history, and because the DHHR had been made aware of a domestic incident during the proceedings which resulted in the issuance of a protective order against the husband. Despite this, A.S. indicated that her husband would be returning to the home to continue planned home renovations.

child by withdrawing from the ICPC process, by failing to visit with the child, and by failing to maintain contact with the DHHR or the child. Before a hearing could be held on this petition, Stacy Emert—a representative of the Tribe—emailed the DHHR, the guardian ad litem ("GAL") and other parties stating that she had been unable to get in contact with the DHHR. A DHHR supervisor responded to this email and advised Ms. Emert to contact the deputy circuit clerk about participation in these proceedings. When Ms. Emert was unsuccessful in doing so, the DHHR personally notified both the deputy clerk and the circuit judge of the Tribe's contact, and thereafter facilitated the Tribe's participation in subsequent hearings.

The next hearing took place on March 7, 2022. The Tribe appeared by Oklahoma counsel Cynthia Burlinson, who reiterated that Respondent Father had tribal ancestry and intimated that the Tribe might seek to intervene pursuant to the ICWA. At this point Respondent Father expressed his surprise at the Tribe's appearance in this matter and reiterated his desire to voluntarily relinquish his parental rights. The circuit court continued the matter to allow Respondent Father the opportunity to complete the voluntary relinquishment process. Before adjourning, however, the circuit court instructed the parties that anyone seeking to participate in this matter should file motions to intervene quickly and obtain local counsel if necessary.[4]

---

[4] In this regard, the Tribe argues that the circuit court erred in requiring it to obtain local counsel. We need not address this argument as the Tribe does not indicate how, if at

6

Once again Respondent Father did not complete the voluntary relinquishment paperwork, so the circuit court scheduled the next hearing for June 13, 2022. At that time the court instructed counsel to file briefs addressing the applicability of the ICWA to this case, and advised the parties that the issue would be addressed at a hearing on August 15, 2022. The Tribe obtained local counsel and on August 9, 2022, moved to intervene in these proceedings. Prior to filing that motion the Tribe petitioned the tribal court to take jurisdiction in this matter, and the tribal court agreed to do so, provided that the circuit court enter an order transferring the case.

At the August hearing the circuit court granted the Tribe's motion to intervene. It then heard argument from all parties, including the Tribe, on the applicability of the ICWA. Thereafter, on September 30, 2022, the court entered an order concluding that the ICWA was inapplicable to these proceedings because, although I.R. is an "Indian child" under the Act, she was not removed from "an intact Indian family" insofar as she was not removed from Respondent Father's custody or the home of another Indian family. In so ruling, the circuit court adopted the Existing Indian Family ("EIF") exception to the

all, it was prejudiced by this requirement. That said, we note that the Bureau of Indian Affairs has declined to require that tribes be permitted to appear without local counsel, but has stated that the agency "agrees with the practice adopted by the State courts that permit Tribal representatives to present before the court in ICWA proceedings regardless of whether they are attorneys or attorneys licensed in that State." Indian Child Welfare Act Proc. ("ICWA Proc."), 81 Fed. Reg. 38778, 38799 (June 14, 2016). This Court has previously permitted a non-attorney Tribal representative to participate in child custody proceedings governed by the ICWA. *See N.R.*, 242 W. Va. 581, 836 S.E.2d 799.

ICWA. In the alternative, the circuit court found that, even if the ICWA applied, the proceedings were at such an advanced stage that "good cause" existed under 25 United States Code section 1911(b) to deny the Tribe's motion to transfer. Based upon these conclusions, the circuit court entered an order on September 30, 2022, denying the Tribe's motion to transfer this action to the tribal court. This petition for writ of prohibition immediately followed.

## II. STANDARD OF REVIEW

This Court has set forth the following standard of review in determining whether a writ of prohibition shall issue:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

## III. ANALYSIS

The Tribe presents two arguments to this Court: that the circuit court exceeded its legitimate powers in (1) adopting the EIF exception, and (2) that the circuit court erred in finding good cause existed to deny the Tribe's motion to transfer to tribal court.[5] We address each of these arguments in turn.

### A. *Existing Indian Family Doctrine*

Preliminarily, the ICWA applies to any "child custody proceeding" involving an "Indian child." 25 U.S.C. § 1903(1); *see also id*. § 1911 (explaining that Indian tribes shall have exclusive jurisdiction over child custody proceedings for children residing or domiciled within the reservation of that tribe, while State courts and tribal courts exercise concurrent jurisdiction over child custody proceedings involving children not residing or domiciled within a reservation). The ICWA defines a "child custody proceeding" to include proceedings dealing with foster care placement, termination of parental rights, pre-adoptive placement, and adoptive placement, *id*. § 1903(1), and defines "Indian child" to

---

[5] The Tribe also argued that the circuit court erred in concluding, in passing, that applying the ICWA to this matter would constitute racially motivated discrimination, as any decision would be based on the Indian heritage of I.R. Because we conclude that the circuit court should have transferred this matter to the tribal court, we find it unnecessary to address this argument; however, we note that the Supreme Court of the United States has plainly stated that "federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. Quite the contrary, classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution and supported by the ensuing history of the Federal Government's relations with Indians." *United States v. Antelope*, 430 U.S. 641, 645 (1997) (footnote omitted).

mean "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id*. § 1903(4). It is undisputed that these proceedings involve not only foster and pre-adoptive placement, but also the termination of parental rights; it is equally clear that I.R. is an Indian child insofar as she is the biological child of a member of the Tribe and is eligible for membership in the Tribe. *Id*. Plainly, the ICWA is applicable to this case.

In arriving at a contrary conclusion, the circuit court adopted a minority doctrine, the EIF exception. This exception originated in the Supreme Court of Kansas, which explained that the ICWA is inapplicable where a child has no connection to his or her Indian parent, has not been in the custody of the Indian parent, and did not reside in a home with any other Indian family. *Matter of Adoption of Baby Boy L*., 643 P.2d 168 (Kan. 1982), *overruled by In re A.J.S*., 204 P.3d 543 (Kan. 2009). In essence, the EIF exception permits a state court to circumvent the requirements of the ICWA if the court concludes that the Indian child is being removed from "a family with [no] significant connection to the Indian community." *Michael J., Jr. v. Michael J., Sr*., 7 P.3d 960, 963 (Ariz. Ct. App. 2000). The Tribe argues that the circuit court's adoption of this exception was clearly erroneous. We agree.

From the time of its inception the EIF exception has come under intense scrutiny in various jurisdictions across the nation. Although the exception was adopted

10

and applied in approximately twenty states in the 1980s and 1990, in recent years all but

seven jurisdictions[6] presented with the exception have either repudiated it—including the

very court that created it[7]—or rejected it in the first instance.[8]  While the reasoning of the

courts rejecting the EIF exception varies, we find especially persuasive the explanation of

the Court of Appeals of Virginia as to why the EIF exception must be rejected.  In

*Thompson v. Fairfax County Department of Family Services*, 747 S.E.2d 838 (Va. Ct. App.

2013), that court explained:

> We decline to recognize the [EIF] Exception for a
> number of reasons.  First, the plain text of the statute does not
> recognize the application of this exception. There is no
> threshold requirement in the Act that the child must have been

---

[6] These jurisdictions include only six states (Alabama, Indiana, Kentucky, Missouri, Nevada, and Tennessee) and a single appellate district in California.  *See, e.g., S.A. v. E.J.P.*, 571 So. 2d 1187 (Ala. Civ. App. 1990); *In re Adoption of T.R.M.*, 525 N.E.2d 298 (Ind. 1988); *Rye v. Weasel*, 934 S.W.2d 257 (Ky. 1996); *C.E.H. v. L.M.W.*, 837 S.W.2d 947 (Mo. Ct. App. 1992); *In re N.J.*, 221 P.3d 1255 (Nev. 2009); *In re Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880 (Tenn. Ct. App. Nov. 19, 1997); *In re Alexandria Y.*, 53 Cal. Rptr. 2d 679 (Cal. Ct. App. 1996) (4th Dist.).

[7] Kansas laid the EIF doctrine to rest in 2009.  *In re A.J.S.*, 204 P.3d at 551 ("[W]e hereby overrule *Baby Boy L.* . . . .and abandon its existing Indian family doctrine.").

[8] *See, e.g.*, *In re Adoption of T.N.F.*, 781 P.2d 973, 977 (Alaska 1989); *Michael J., Jr.* 7 P.3d at 963-64; *In re N.B.*, 199 P.3d 16, 20-22 (Colo. App. 2007); *Indian Tribe v. Doe* (*In re Baby Boy Doe*), 849 P.2d 925, 927 (Idaho 1993); *Tubridy v. Ironbear* (*In re Adoption of S.S.*), 622 N.E.2d 832, 838-39 (Ill. App. Ct. 1993), *rev'd on other grounds*, 657 N.E.2d 935 (Ill. 1995); *Dep't of Soc. Servs. v. Boyd* (*In re Elliott*), 554 N.W.2d 32, 35-36 (Mich. Ct. App. 1996); *In re Adoption of Quinn*, 845 P.2d 206, 209 n. 2 (Or. Ct. App. 1993), *rev'd on other grounds*, 881 P.2d 795 (Or. 1994); *Adoptive Couple v. Baby Girl*, 731 S.E.2d 550, 558 n. 17 (S.C. 2012), *rev'd on other grounds*, 570 U.S. 637 (2013); *In re Adoption of Baade*, 462 N.W.2d 485, 489-90 (S.D. 1990); *D.J.C. v. P.D.C.* (*State ex rel. interest of D.A.C.*), 933 P.2d 993, 999-1000 (Utah Ct. App. 1997).

born into or must be living with an existing Indian family, or that the child must have some particular type of relationship with the tribe or his or her Indian heritage. "Because Congress has clearly delineated the nature of the relationship between an Indian child and tribe necessary to trigger application of the Act, judicial insertion of an additional criterion for applicability is plainly beyond the intent of Congress and must be rejected." *In re Baby Boy C*., 27 A.D.3d 34, 805 N.Y.S.2d 313, 323 (N.Y.App.Div.2005) (citations omitted).

Second, cases recognizing the exception ignore Congress's intent "to protect the best interests of Indian children *and* to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902 (emphasis added). As the Supreme Court recognized in [*Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30 (1989)], "Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." 490 U.S. at 49 []. The [EIF] Exception takes an unnecessarily restrictive approach to ICWA, one that would frustrate Congress's intent to protect tribal interests.

Finally, in its findings, Congress stated "that the States … have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5). The [EIF] Exception requires courts to assess the "Indianness" of a particular Indian child, parent, or family, a subjective determination that courts "'are ill-equipped to make.'" *Baby Boy C*., 27 A.D.3d at 49, 805 N.Y.S. at 324 (quoting *In re Alicia S*., 65 Cal.App.4th 79, 76 Cal.Rptr.2d 121, 128 (1998)). "Since ICWA was passed, in part, to curtail state authorities from making child custody determinations based on misconceptions of Indian family life, the [EIF] exception, which necessitates such an inquiry, clearly frustrates this purpose." *Id.* (citations omitted).

*Thompson*, 747 S.E.2d at 847. We agree with this reasoning; the EIF exception is plainly

incompatible with the explicit provisions of the Act and contrary to Congress's stated intent

in passing the Act, namely the protection of Indian tribes and their resources, including their children. *See* 25 U.S.C. § 1901.

Our decision in this regard is further supported by guidance from the Bureau of Indian Affairs ("BIA") set forth in its 2016 BIA Guidelines pertaining to application of the Act's provisions. Guidelines for Implementing the Indian Child Welfare Act ("2016 Guidelines"), 25 C.F.R. §§ 23.1 to -23.144 (2016). The 2016 Guidelines state, in relevant part:

> In determining whether ICWA applies to a proceeding, the State court may not consider factors such as the participation of the parents or the Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum.

*Id*. § 23.103(c). This unequivocal statement plainly dispels any notion that the EIF exception is compatible with the ICWA. Accordingly, we join the "swelling chorus of [jurisdictions] affirmatively reject[ing] the EIF exception[,]" ICWA Proc., 81 Fed. Reg. 38778, 38802 (June 14, 2016), and hold that West Virginia does not recognize the Existing Indian Family exception to the Indian Child Welfare Act, 25 U.S.C. §§ 1901 to -1963 (2021). Accordingly, the circuit court erred in adopting the EIF exception and subsequently relying on that exception to determine that the ICWA was inapplicable to this case.

13

**B.** *Good Cause to Deny the Motion to Transfer to Tribal Court*

Despite its conclusion that the ICWA did not apply to the instant matter, the circuit court proceeded to determine, in the alternative, that good cause existed to deny the Tribe's motion to transfer this case to tribal court because the underlying proceedings were at an "advanced stage." The circuit court explained that this case had been pending for more than three years at the time the Tribe made its motion to transfer, and thus it would be disingenuous to argue that the proceedings were not at an advanced stage. As it did below, the Tribe argues before this Court that the proceedings are not at an advanced stage insofar as Respondent Father has not even been adjudicated as an abusing or neglectful parent. After a thorough review of the relevant authorities, we agree with the Tribe that the circuit court erred in concluding that good cause existed to deny the Tribe's motion to transfer.

The Tribe's motion to transfer this matter to the tribal court was made pursuant to 25 United States Code section 1911(b), which provides:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe.

Succinctly put, this provision requires a state court to transfer a child custody proceeding to tribal court unless: (1) a parent objects to the transfer; (2) the tribal court declines to

14

accept the transfer; or (3) "good cause" exists to deny the transfer. *See id*. The first

exception is inapplicable insofar as Respondent Father supports the Tribe's motion, and

I.R.'s mother's parental rights were terminated well before the motion to transfer was

made. The second exception is likewise inapplicable because the tribal court has accepted

jurisdiction of this case contingent upon the circuit court's entry of an order transferring

the matter. The circuit court relied solely upon the third exception—that there was "good

cause" to deny transfer—in denying the Tribe's motion.

The ICWA does not define "good cause," but the Code of Federal

Regulations explicitly provides what *cannot* be considered in making a good cause

determination. Specifically, 25 Code of Federal Regulations section 23.118(c) provides:

> In determining whether good cause exists, the court must not consider:
>
> *(1)    Whether the foster-care or termination-of-parental rights proceeding is at an advanced stage if the Indian child's parent, Indian custodian, or Tribe did not receive notice of the child-custody proceeding until an advanced stage;*
>
> (2)    Whether there have been prior proceedings involving the child for which no petition to transfer was filed;
>
> (3)    Whether transfer could affect the placement of the child;
>
> (4)    The Indian child's cultural connections with the Tribe or its reservation; or
>
> (5)    Socioeconomic conditions or any negative perception of Tribal or BIA social services or judicial systems.

(Emphasis added.) In finding that subsection (c)(1) did not prohibit the circuit court from considering the "advanced stage" of this proceeding, the court relied upon a now-defunct provision in the 1979 BIA Guidelines, which enumerated a list of situations that *did* constitute "good cause" to prevent transfer. Guidelines for State Cts.; Indian Child Custody Proc. ("1979 Guidelines"), 44 Fed. Reg. 67584 (Nov. 26, 1979). That list indicated that good cause to deny transfer existed where "[t]he proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the motion to transfer promptly after receiving notice of the hearing." *Id*. at 67591. In essence, this language provides that a state court may deny a motion to transfer where the moving party *could have moved* to transfer but delayed doing so, thus effectively sitting on its right to change venue. *See id*. Before this Court several of the parties cited this guidance as a basis for arguing that the Tribe is not entitled to transfer because it knew of these proceedings in December 2021 but did not move to transfer until eight months later in August 2022. What the circuit court and the parties fail to recognize is that the 1979 Guidelines were explicitly abrogated and replaced by the BIA when it promulgated the 2016 Guidelines. *See* Guidelines for Implementing the Indian Child Welfare Act, 81 Fed. Reg. 96476 (Dec. 30, 2016) ("The [2016] guidelines replace the 1979 and 2015 versions[.]"). Therefore, we do not find the 1979 Guidelines persuasive, nor do we rely upon any guidance contained therein.

In discussing its decision to abrogate the 1979 Guidelines the BIA provided a detailed explanation as to why it specifically displaced the provision upon which

16

respondents rely. ICWA Proc., 81 Fed. Reg. at 38823. First, the BIA explained that motions to transfer to tribal court are to be treated as a "modified doctrine of forum non conveniens," or a motion to change venue pursuant to 28 United States Code section 1404 (2021), which may be granted at any time during the pendency of the proceedings. *Id*. ("The mere passage of time is not alone a sufficient reason to deny a motion to transfer pursuant to 28 U.S.C. § 1404; nor is it for 25 U.S.C. § 1911(b)."); *see also Matter of Appeal in Pima Cnty. Juv. Action No. S-903*, 635 P.2d 187, 191 (Ariz. Ct. App. 1981) ("[25 U.S.C. § 1911(b)] was intended to permit a state court to apply a modified doctrine of forum non conveniens."). Second, the BIA noted that the parents or the Tribe may have legitimate interests in delaying their motion to transfer the case to tribal court. ICWA Proc., 81 Fed. Reg. at 38823. For example, the BIA notes that the Tribe or parents may have no reason to transfer the case during the "foster care" phase, where the child has been only temporarily removed from the home with a goal of reunification with the parents, because the expectation is the child will be returned to his or her parents. *Id*. (citing *In re Interest of Zylena R*., 825 N.W.2d 173 (Neb. 2013)). However, once the State signals it intends to terminate parental rights, the Tribe and parents have a legitimate interest in having the matter decided by a tribal court. *Id*. Said the BIA:

> The Tribe or parent rationally decides that seeking transfer of a foster-care proceeding would not support the goal of reunification of the Indian child with her parent(s). But once the State abandons this goal, and seeks to terminate parental rights, the Tribe's or parent's calculus might reasonably change. If time limits were imposed by moving to transfer, Tribes might be forced to seek transfer early in a foster-care proceeding, even if that outcome does not facilitate reunification. The [BIA] believes that this would undermine

17

the goals and intent of ICWA, and not produce the best outcomes for Indian children.

For these reasons, the final rule provides that a request for transfer *may be made at any stage within each proceeding.*

*Id*. (Emphasis added.)

It is critical to note that the ICWA divides cases into different phases, designated as proceedings (e.g., the "foster care" phase where reunification is the goal, and the "termination" phase where a parent's rights will be terminated and the child placed in an adoptive home). *See* 25 C.F.R. § 23.118 (separating "foster-care proceedings" from "termination-of-parental-rights proceedings" for purposes of determining whether an individual proceeding is at an advanced stage). Thus, while the overarching length of a single abuse and neglect case may span many months, or even several years, the pertinent question is how advanced the current "proceeding" is within the case. ICWA Proc., 81 Fed. Reg. at 38825 ("The final rule also clarifies that 'advanced stage' refers to the proceeding, rather than the case as a whole. Each individual proceeding will culminate in an order, so 'advanced stage' is a measurement of the stage within each proceeding."). This means that the circuit court should not have based its decision on the fact that the case had been ongoing since January 2020—a span of nearly three-and-a-half years. Instead, the circuit court should have only considered whether the current phase, or proceeding, was at an advanced stage.

In our review of the appendix record this case has involved at least three individual "proceedings" as contemplated by the ICWA: (1) termination of the mother's parental rights; (2) foster care during attempted unification with Respondent Father; and (3) termination of Respondent Father's parental rights. The first proceeding began in January 2020 when I.R. was removed from her mother's custody and the DHHR sought termination of the mother's parental rights; that proceeding concluded in August 2020 when the mother's rights were terminated. The next proceeding encompassed the DHHR's myriad efforts to unify I.R. with Respondent Father or to place her with other relatives, such as A.S.. That proceeding spanned approximately one year and ended in January 2022 when the DHHR filed an amended abuse and neglect petition alleging that Respondent Father had abandoned the child. The next "proceeding," i.e., termination of Respondent Father's parental rights, began with the filing of DHHR's second amended petition in March 2022.

The proceeding regarding termination of the parental rights of Respondent Father was not at all advanced at the time the Tribe filed its motion to transfer the proceeding. Respondent Father had not been adjudicated; indeed, neither a preliminary nor adjudicatory hearing had even been scheduled. While five months passed between March 2022 and the Tribe's motion to transfer in August 2022, the record reveals that those months were devoted to ascertaining whether the ICWA applied to this case, and not to any consideration of the merits of the amended petition. In short, there was nothing "advanced" about this proceeding when the Tribe moved to transfer. Accordingly, we

19

conclude that the circuit court clearly erred in determining that good cause existed to deny transfer of this matter to the tribal court. *See* Syl. Pt. 4, in part, *Berger*, 199 W. Va. at 14-15, 483 S.E.2d at 14-15 (explaining that a writ of prohibition may issue where the lower tribunal's order is clearly erroneous as a matter of law).

## IV.  CONCLUSION

For the reasons stated herein, we grant the Tribe's petition for writ of prohibition and prohibit enforcement of the circuit court's September 30, 2022, Order Denying Transfer.  We remand this matter to the circuit court with directions to enter an order transferring jurisdiction in this action to the District Court of the Delaware Tribe.

Writ Granted.